**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

---

X.AI LLC, CTC PROPERTY LLC,
AND MZX TECH LLC,

      Plaintiffs,

                                Case No. _____

v.

DARANA HYBRID, INC., CUTTELL
MOTORSPORTS, LLC d/b/a
INTERNATIONAL HOT ROD
ASSOCIATION, and
DARRYL CUTTELL,

      Defendants.

---

**COMPLAINT**

---

Plaintiffs x.AI LLC ("xAI LLC"), CTC Property LLC ("CTC"), and MZX Tech LLC ("MZX"), for their Complaint against Defendants Darana Hybrid, Inc. ("Darana"), Cuttell Motorsports, LLC d/b/a International Hot Rod Association ("IHRA"), and Darryl Cuttell, state as follows:

**<u>INTRODUCTION</u>**

1.      This lawsuit concerns a general contractor that overbilled and defrauded its client while building artificial-intelligence data centers in and around Memphis, Tennessee.  Plaintiff CTC owns the data centers.  Defendant Darana – controlled by its owner, Defendant Darryl Cuttell – was the general contractor that oversaw construction.

2.      Darana and Cuttell overbilled CTC by hundreds of millions of dollars while selling out their own suppliers and subcontractors along the way.  They breached their contract

with CTC, secretly marked up subcontracted labor well beyond the contractual cap, and diverted money to Cuttell's personal side projects. Throughout, Cuttell used a web of affiliated subcontractors and suppliers to implement his scheme and conceal the rampant overcharging.

3.    The parties' contract (the Master Services Agreement, or "MSA") allowed Darana to use subcontracted labor only if it met certain conditions. Most notable was a negotiated ceiling on Darana's markups: the contract capped those markups at 10% over the amount that the subcontractors charged to Darana. Darana violated that cap and billed CTC at markups as high as 880%. CTC estimates that these overcharges alone amount to at least $500-$800 million.

4.    At the same time Defendants were overcharging CTC, they were refusing to pay their own vendors while siphoning off CTC's funds to promote Cuttell's side projects. Hot rod racing was perhaps the most egregious. Cuttell owns an international racing association, and he saw in the Memphis project a way to fund his racing ambitions at CTC's expense. Darana charged CTC for unauthorized, out-of-scope work on hot rod projects, including the construction of a local raceway that had nothing to do with the data centers CTC had hired Darana to build. Defendants not only billed CTC for their work on the raceway but also misappropriated trademarks to market their unrelated projects for their own benefit.

5.    When CTC discovered Defendants' rampant overcharging, it terminated Darana for cause. Unfortunately, that termination only caused Darana to escalate its misconduct. To gain leverage in its billing dispute with CTC, Darana withheld tens of millions of dollars it owes to the very subcontractors and suppliers it hired and oversaw. Many are local businesses that remain vital to ongoing construction at the data center sites. The MSA requires Darana to pay them. Yet Darana is refusing to comply and is pointing the finger at CTC instead.

6.      CTC has tried to do right by those vendors.  Although CTC was not required to pay Darana another dollar given the scale of Darana's cheating under the contract, it recently wired Darana $45 million on Darana's promise that critical downstream suppliers would receive the money Darana owed them.  Darana promised to earmark CTC's payment for those vendors and told CTC it would disburse the funds to them.  It diverted the money instead.  Worse, Darana tried to blame CTC, telling its vendors that CTC was the one causing them not to be paid.

7.      CTC has already paid Darana more than enough for Darana to honor its commitments to its vendors.  Having siphoned the money, however, Darana now refuses to follow through.  Rather than pay its vendors, Defendants are blaming the victim of their overcharges and urging their vendors to take action against CTC.  Those improper threats are imperiling construction and flout Darana's duty to ensure an orderly wind-down of its work.

8.      Darana did all this to cover up its own massive breach of contract and theft of CTC's money.  Even aside from Darana's shameful treatment of its own vendors, there was barely a section of the MSA with which it managed to comply.  Its impermissible markups and out-of-scope work were the most egregious violations.  But others abounded.  For example, Defendants charged CTC for phantom labor, flouted their exclusivity commitments, and unlawfully revoked key permits.  They further misled CTC by misdescribing their work and withholding key billing data the contract required them to supply.  And when CTC exercised its contractual right to audit Darana's payment records, Darana simply refused to produce them.  All told, these serial contract breaches have inflicted upwards of $800 million in damages.

9.      CTC tried to resolve this dispute without litigation.  Indeed, CTC appreciates the hard work that the subcontractors and suppliers have put into making these data centers a success.  It wants all innocent vendors to be paid, and in some cases, has already paid them

3

directly.  But ultimately, these payments are *Darana's* responsibility.  If CTC gives Darana money for such vendors, Darana has demonstrated it will simply pocket the funds – all so Cuttell can continue to enrich himself at the expense of everyone else involved in the project.

10.    CTC is left with no other choice.  It brings this suit to remedy Defendants' ongoing misconduct and recover the money they stole from both CTC and their own vendors.

## THE PARTIES

11.    Plaintiff x.AI LLC ("xAI LLC") is a limited liability company organized under the laws of Nevada.  Its principal place of business is in Texas.  It is managed by its sole member, x.AI Corp. ("xAI"), which is a Nevada corporation with a principal place of business in Texas.  Therefore, for purposes of diversity jurisdiction, xAI LLC is a citizen of Nevada and Texas.

12.    Plaintiff CTC Property LLC ("CTC") is a limited liability company organized under the laws of Wyoming and managed by its sole member, xAI LLC, which is a citizen of Nevada and Texas.  CTC is therefore also a citizen of Nevada and Texas.

13.    Plaintiff MZX Tech LLC ("MZX") is a limited liability company organized under the laws of Wyoming and managed by its sole member, CTC, which is a citizen of Nevada and Texas.  MZX is therefore also a citizen of Nevada and Texas.

14.    Defendant Darana Hybrid, Inc. ("Darana") is a Tennessee corporation that maintains its principal place of business in Ohio.  For purposes of diversity jurisdiction, Darana is a citizen of Tennessee and Ohio.  Darana maintains an office and conducts business in Shelby County, Tennessee, within the Western Division of this District.  Darana can be served through its Registered Agent, Cogency Global Inc., at 992 Davidson Drive, Suite B, Nashville, Tennessee 37205-1051.

15.    Defendant Cuttell Motorsports, LLC d/b/a International Hot Rod Association ("IHRA") is a limited liability company organized under the laws of Ohio, with its principal

4

place of business in Ohio.  Upon information and belief, Cuttell Motorsports, LLC is managed by its sole member, Darryl Cuttell, who is a citizen of Ohio.  Therefore, IHRA is also a citizen of Ohio.  IHRA can be served through its registered agent, C T Corporation System, at 300 Montvue Road, Knoxville, Tennessee 37919-5546.

16.     Defendant Darryl Cuttell is a citizen and resident of Ohio.  Cuttell can be served at 345 High Street, Suite 510, Hamilton, Ohio 45011.

## JURISDICTION AND VENUE

17.     The Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1) because this is a civil action between citizens of different States and because the amount in controversy exceeds $75,000, exclusive of interest and costs.  The Court also has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff xAI asserts claims under the Lanham Act, 15 U.S.C. § 1051, and supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367.

18.     The Court has personal jurisdiction over Darana because it is incorporated in Tennessee.  Darana purposefully transacted business in Tennessee, including through its construction of data centers near Memphis, and the claims asserted in this action arise out of or relate to those transactions.  Darana also consented to personal jurisdiction by agreeing that disputes arising out of the MSA must be brought in Tennessee.  *See* MSA § 9.17.

19.     Cuttell likewise purposefully transacted business in this District, including in his business dealings with CTC through Darana in connection with the construction of data centers near Memphis.  CTC's claims against Cuttell arise out of or relate to those contacts.

20.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, including the events detailed below concerning data center construction projects in and around Memphis.  Venue is also proper because a substantial part of the property that is the subject of this action is

5

situated in this District, and because Darana consented to venue in this District by agreeing that disputes arising out of the MSA "shall" be litigated in "the appropriate court of law located in Memphis, Tennessee." MSA § 9.17.

21.     Under Local Rule 3.3 and 28 U.S.C. § 123(c)(2), this action is properly filed in the Western Division of the United States District Court for the Western District of Tennessee because the claim arose, the events complained of occurred, and/or the property at issue is located in Shelby County, which is within the Western Division. In addition, Section 9.17 of the MSA states that the "parties hereby agree that should litigation be necessary, the forum for said litigation shall be the appropriate court of law located in Memphis, Tennessee."

## FACTUAL ALLEGATIONS

### I.     CTC BEGINS CONSTRUCTING A NETWORK OF DATA CENTERS IN THE GREATER MEMPHIS AREA

22.     CTC's parent company, xAI, was founded in 2023 to "[a]ccelerate human scientific discovery."[1] xAI creates "[f]rontier reasoning, real-time voice, and generative media—designed to extend what humanity can know and do." xAI's premier product is Grok, an artificial-intelligence assistant. Since its founding, xAI has grown from a startup with a handful of researchers to one of the world's most innovative AI labs. It provides leading AI models, computing infrastructure, and developer tools to power commercial expansion.

23.     xAI's cutting-edge AI models require significant computing power. To that end, CTC set out to construct a fully functional, single-connected AI training cluster in Memphis, powered by the world's most powerful supercomputer. CTC calls this project "Colossus."

---

[1] xAI, *About*, https://x.ai/company (last visited Aug. 2, 2026).

24.    CTC selected an abandoned Electrolux factory in South Memphis as Colossus's future home and broke ground in May 2024.  Local leaders hailed Colossus as "[Memphis's] defining moment,"[2] and the project gained popular support.  In breaking ground on Colossus, CTC made a large capital investment in the local community, committed to build a wastewater recycling facility, and employed many local workers while creating new jobs.  Memphis leaders thus welcomed CTC's development in the "Digital Delta."

25.    CTC and MZX subsequently expanded their work in the Greater Memphis area to include additional data centers – MACROHARD and MACROHARDER – and power generation at a former Duke Energy plant site in Southaven, Mississippi.

## II.    CTC ENTERS A MASTER SERVICES AGREEMENT WITH DARANA FOR CONSTRUCTION OF COLOSSUS

26.    CTC selected Darana as the prime contractor for electrical and mechanical services on its projects in the Greater Memphis area.  Darana is a Hamilton, Ohio-based electrical and mechanical contractor and subcontractor.  It has been in business since 1985.

### A.    The Master Services Agreement

27.    CTC and Darana negotiated a Master Services Agreement ("MSA") to govern Darana's work on Colossus.  The MSA is attached as Exhibit 1.  The MSA took effect on April 15, 2024 and was fully executed on August 5, 2024.  It lists CTC as the "Company" and Darana as the "Contractor."  It contains these key provisions, among others:

28.    **Scope of Work.**  The MSA restricted the scope of Darana's work and barred Darana from billing for work outside that scope.  It first attached a "Basic Information Sheet" supplying the initial parameters for Darana's work.  The Basic Information Sheet specified that

---

[2] Greater Memphis Chamber, *xAI Memphis Announces Expansion of Supercomputer with Addition of Tech Companies in Digital Delta* (Dec. 4, 2024), https://perma.cc/5WP5-HDZK.

Darana should work on "Project Colossus."  For the "Price" and "Invoice" requirements governing that work, it incorporated the terms set forth in future "Statement(s) of Work."

29.    Section 4 of the MSA described those statements of work ("SOWs"), mandating that the "applicable SOW shall set forth the fees and charges that [CTC] shall be obligated to pay for or in connection with the Services" Darana performed.  The same provision conditioned CTC's payment obligation on the existence of an agreed SOW.  It left no doubt about what would happen if Darana performed work outside an SOW:  "[a]ny Work performed by [Darana] unless pursuant to a SOW shall have been done solely at [Darana]'s risk, and [Darana] hereby waives and shall not make any claims, including those for unjust enrichment or *quantum meruit*, based on performance of Work that has not been authorized in writing by [CTC]."

30.    The MSA created one narrow carveout to the SOW requirement, for Purchase Orders.  Under Section 9.3, which was the MSA's integration clause, "Purchase Orders between the Parties entered into prior to execution of this Agreement shall be treated as SOWs."  So if the parties entered a purchase order, the contract treated that purchase order as an SOW that satisfied the MSA's precondition for payment.  Without a valid purchase order, however, Darana was required to submit an agreed-on SOW before seeking payment under the MSA.

31.    The rest of section 9.3 fully integrated the MSA as constituting "the entire understanding and agreement of the parties related to the subject matter hereof and supersedes and replaces any and all prior or contemporaneous discussions, agreements and understandings regarding such subject matter."

32.    In addition, the parties agreed that the MSA could only be changed "by a written document signed by authorized representatives of [CTC] and [Darana].  No course of dealing or course of conduct shall operate to modify this Agreement."  MSA § 9.6.

33.     The MSA further clarified that Darana was waiving its right to payment for out-of-scope work "notwithstanding any course of dealing between the parties or any implied acceptance of any Work by Company."  MSA § 4.  The term "Work," in turn, was defined as "any services or work that Contractor provides pursuant to the terms of this Agreement or any SOW."  MSA § 10.  Together, those provisions required Darana to disclose and obtain approval before commencing work that could be charged to CTC.  Unless and until Darana provided an approved SOW governing each type of work, CTC had no duty to pay Darana anything.

34.     **Subcontractor Markup Cap.**  On top of the protections conferred by the required SOWs, CTC also bargained for a cap on Darana's ability to mark up subcontracted labor and materials.  Section 2.4 allowed Darana to use subcontractors on the project, but "only upon Company's prior written consent."  It similarly allowed Darana to contract with suppliers to source materials for the project.  But in both cases, it limited Darana's markup to 10%.  Section 2.4 stated that, "[i]n the event [Darana] performs Services through subcontractors or purchases material and equipment from suppliers, [Darana's] markup shall be stated in a SOW, and shall not exceed ten percent (10%)."

35.     **Invoicing.**  The MSA also established an invoicing process.  Under Section 4.1, CTC agreed to pay invoices "not reasonably disputed" within 45 days.  At the same time, that provision allowed CTC to withhold disputed payments.  It gave CTC "the right to withhold any payments, or portions thereof, otherwise due for (i) unsatisfactory progress or performance of Services, (ii) [Darana's] failure to satisfy any payment obligations in relation to the Services; (iii) any damages or set-offs incurred by [CTC] with respect to the applicable SOW, or (iv) to offset payments previously made for unsatisfactory Services against future amounts owing under an applicable SOW, until such Services are performed to [CTC's] satisfaction."

36.     The MSA also preserved CTC's flexibility to pay disputed amounts without affecting its broader rights.  Even if CTC chose to pay disputed amounts under Section 4.2, that choice did not prejudice its right to dispute and recover those amounts later.  As the contract made clear:  "[n]o payment hereunder shall constitute acceptance or approval of any services."

37.     **Audit Rights.**  To ensure that CTC had full information about the project and Darana's charges, the MSA also gave CTC robust audit rights.  In Section 9.12, Darana agreed that "[a]ll payments received pursuant to this Agreement, and [Darana's] Services and workplace area and related offices shall be subject to audit and inspection by Company or any authorized representatives acting on [CTC's] behalf."  Beyond that broad audit right, the MSA required Darana to provide information needed for CTC to validate its invoices:  "[Darana] shall comply with all reasonable requests by [CTC] to make available books and records necessary to substantiate [Darana's] charges and invoices for reimbursement."  MSA § 9.12.

38.     **Intellectual Property Protections.**  To protect CTC, xAI LLC, and their affiliates from misuse of their trademarks and trade names, the MSA also stated that, "[w]ithout [CTC's] prior written approval, [Darana] shall have no right to use any trademark or trade name of [CTC] or any affiliate of [CTC]."  MSA § 8.2.

39.     Further, the MSA confirmed that intellectual property developed during the project belonged to CTC and could not be retained or used by Darana after termination.  Specifically, Section 8.3 provided:  "All documents (including drawings, plans and specifications) furnished by [Darana] pursuant to this Agreement are the instruments of service to the Project, and [CTC] shall retain all common law, statutory and other reserved rights in such documents, including intellectual property and copyright."  More broadly, "[a]ll Confidential Information, regardless of form, shall be the property of [CTC] or the applicable affiliate of

10

[CTC], and shall be returned to [CTC] or the applicable affiliate at the expiration or earlier termination of this Agreement."  MSA § 8.1.2.

40.     **Termination.**  The MSA granted CTC the right to terminate with or without cause.  Under Section 7.1, CTC had the absolute, discretionary right to terminate the MSA "at any time, for its convenience and without cause."

41.     Under Section 7.2, CTC also had the right to terminate "as a result of a breach or default by" Darana.  If CTC terminated Darana due to a breach or default, CTC had the right to withhold all further payment – even as to otherwise-undisputed amounts – if reasonably necessary to compensate for the breach.  Section 7.2 stated:  "In the event [CTC] terminates this Agreement or any SOW as a result of a breach or default by [Darana], [Darana] shall remain liable to [CTC] for any and all damages incurred or suffered by [CTC] as a result of such breach or default; and [CTC] may, in addition to any other rights and remedies provided herein, or at law or in equity, withhold and offset any amount otherwise owed to [Darana] to the extent reasonably necessary to compensate [CTC] for such damages."

42.     The parties further agreed that, after termination, Darana "shall cooperate in the orderly wind-down of the parties' performance" of the MSA.  MSA § 7.4.

**B.     First Amendment to the MSA**

43.     In April 2025, the parties amended the MSA, expanding the scope of Darana's work to include additional data center sites and granting Cuttell an equity incentive that would vest if certain conditions were satisfied.  They memorialized those terms in MSA Amendment Number One ("Amendment One"), which is attached as <u>Exhibit 2</u>.  It took effect on April 12, 2025.

11

44.     Amendment One's scope was limited.  Section 8 emphasized that, "[e]xcept as amended hereunder, all terms of the Agreement remain unmodified and in full force and effect and nothing in the Agreement is modified by this Amendment by implication or otherwise."

45.     **Covered Projects and Services.**  Amendment One modified the Basic Information Sheet's description of the "Project where Services will be performed" to include "Project Colossus" on Paul R. Lowry Road in Memphis, and Project Tulane, on Tulane Road in Memphis.  Amendment One ¶ 1.  It also specified that "[a]dditions . . . to the Project and Services may [be] accomplished by Statements of Work and/or Purchase Orders."  *Id.*  The parties, including CTC, MZX, and Darana, subsequently expanded the project via purchase orders to include work for MZX at MACROHARDER and the former Duke Energy plant in Mississippi.  References to CTC include CTC and its affiliate, MZX, as Darana routinely overcharged CTC both directly and by overcharging on MZX purchase orders.

46.     **Rate for Darana's Services.**  Amendment One also modified the MSA's original "Basic Information Sheet" by specifying rates Darana could charge for services it performed:

1. Project Colossus.  For all electrical and mechanical Services performed by [Darana] for the Colossus Project, [CTC] will pay [Darana] at the rate of $245 per hour, unless a lower rate is set forth in a Purchase Order accepted by [Darana].

2. Project Tulane.  Commencing on the Amendment 1 Effective Date, for all electrical and mechanical Services performed by [Darana] for the Tulane Project, [CTC] will pay [Darana] at the rate of $200 per hour, unless a lower rate is set forth in a Purchase Order accepted by [Darana].

Amendment One ¶¶ 2.1, 2.2.

47.     Amendment One did not modify the MSA's cap on Darana's markups.  It did not even reference, much less eliminate, Section 2.4 of the original MSA, which continued to bar

12

Darana from imposing a markup that exceeded 10%.  That provision was among the MSA

"terms" that "remain[ed] unmodified and in full force and effect."  Amendment One § 8.

48.    **Equity Incentive and Exclusivity.**  Amendment One also added an exclusivity

provision to the MSA, in a new Section 2.8.  That provision required Darana and all "its affiliates

as applicable" to "exclusively work for [CTC] for performing Services related to Data Center

Infrastructure . . . Projects."  Amendment One § 4 (adding Section 2.8 to the MSA).  Darana and

its affiliates thus agreed to work solely on CTC data centers during the "Exclusivity Period,"

which ran from April 12, 2025, through April 12, 2027.

49.    Section 2.3 of Amendment One also created an "Equity Incentive" for Cuttell.

That incentive entitled Cuttell to restricted stock options worth $28,500,000 if three separate

milestones tied to GPU commissions were reached.

50.    Cuttell's right to the Equity Incentive vested "if and only if" two conditions were

met.  *See* Amendment One, Ex. A ¶ 4.  *First*, Darana had to remain "in strict compliance with the

terms of the Agreement including, without limitation, **Section 2.8** (Exclusivity)."  Thus, if

Darana, Cuttell, or any of his affiliated businesses worked on anything besides CTC data centers

during the exclusivity period, Cuttell's incentive would not vest.  *Second*, Darana had to

"continue the provision of Services for [CTC] until the expiration of the Exclusivity Period."  *Id.*

So if Darana stopped performing services for CTC at any point before April 12, 2027 – because

the MSA terminated or for any other reason – Cuttell would lose the incentive.  Section 2.3

emphasized that, "[i]f such vesting conditions shall not be met . . . [,] the [equity incentive

awards] will be automatically forfeited without any further action."  *Id.*

C.    **Second Amendment to the MSA**

51.    The parties amended the MSA again on February 19, 2026, which they

memorialized in MSA Amendment Number Two ("Amendment Two").  Amendment Two is

13

attached as <u>Exhibit 3</u>.  Like Amendment One, Amendment Two left all MSA terms in place

unless expressly modified.  *See* Amendment Two ¶ 2 ("Except as amended hereunder, all terms

of the Agreement remain unmodified and in full force and effect and nothing in the Agreement is

modified by this Amendment by implication or otherwise.").

52.    Under Amendment Two, one third of Cuttell's equity incentive shifted to

Darana's "Key Employee."  Cuttell retained rights to the remaining two-thirds.  Cuttell became a

"Recipient" under the MSA, with rights and obligations under the agreement, as amended.

Amendment Two, Ex. A ¶ 3.

53.    Cuttell's equity incentives remained subject to the two vesting conditions outlined

above.  For both individuals, the incentive vested "if and only if" (i) "Recipient is in strict

compliance with the terms of the Agreement including, without limitation, Section 2.8

(Exclusivity), and (ii) Recipient continued the provision of Services for [CTC]" until April 12,

2027.  Amendment Two, Ex. A ¶ 4.

### III.    DARANA SYSTEMATICALLY BREACHED THE MSA AND TOOK STEPS TO CONCEAL THOSE BREACHES FROM CTC

54.    From April 2024 through July 2026, CTC paid Darana roughly $1.4 billion for

work on CTC's data centers.  CTC trusted and relied on Darana as a vital partner in completing

the project.  But Darana abused that trust.  It serially breached the MSA, misrepresented its work,

engaged in a concerted scheme to inflate its invoices to CTC (both directly and through its

wholly owned subsidiary MZX) and withheld required data.  That misconduct led CTC to

terminate the MSA for cause.

### A.    Darana Secretly Marked Up Subcontracted Labor 800% Or More, Leading It To Overbill CTC for Labor by $500-$800 Million

55.    The MSA allowed Darana to use labor subcontractors only with CTC's prior

written approval.  Once approval was given, the MSA capped Darana's markup on such

14

subcontracted labor.  To implement the cap, the MSA imposed two restrictions, requiring Darana to (a) clearly state its markup in a SOW, and (b) limit its markup to 10% over the rates Darana itself paid the subcontractors.  For example, if Darana hired a subcontractor that charged it $30 per hour, Darana could mark up that labor by at most 10%, invoicing CTC no more than $33 per hour.  The MSA required transparency throughout the process.  Darana was required to disclose its markup so that CTC could ensure compliance with the 10% cap.

56.    Darana breached those requirements.  Throughout the project, it relied heavily on subcontractors without seeking CTC's prior approval and without disclosing its markup in any SOW or purchase order.  On information and belief, Darana employed only between 50 and 70 employees itself.  Darana used subcontractors for the vast majority of the labor on the projects.

57.    Darana compounded that breach by then imposing excessive markups on the labor it sourced from those unapproved subcontractors.  Those undisclosed markups exceeded the contract's 10% cap many times over.  Indeed, Darana charged CTC a uniform rate for all labor, whether performed by Darana or its subcontractors.  That rate was orders of magnitude higher – typically 200% to 300% and, at times, upwards of 800% higher – than the rate that Darana paid the subcontractors who performed the work.

58.    Darana concealed this practice from CTC by submitting invoices that failed to disclose that subcontracted labor was used, the rates subcontractors were charging Darana, the hours worked by subcontractors, or the markup Darana had applied.  By submitting invoices with all services billed at the rate for labor Darana itself performed, Darana was representing that it, and not subcontractors, had performed the work.  That was false.  CTC paid those deceptive and misleading invoices until May 2026.  From June 2024 through May 2026, CTC paid Darana

15

more than $900 million for labor alone, much of which was inflated by the excessive, undisclosed markups that Darana was extracting.

59.    In May 2026, CTC invoked its audit rights under MSA Section 9.12, demanding that Darana provide all "books and records necessary to substantiate Contractor's charges and invoices for reimbursement." CTC further requested "all invoices for subcontractors and suppliers for both material and labor." Darana refused the request, claiming that "[Darana's] ability to disclose certain vendor pricing, subcontractor relationships, and related proprietary information remains limited due to the confidentiality obligations governing those relationships." Darana also refused to disclose which of the workers were subcontractors. It further refused to disclose the hourly rates that subcontractors charged to Darana. Without that information, CTC cannot calculate the exact amount of Darana's prohibited overcharge.

60.    Although Darana has refused CTC's audit requests, CTC does have incomplete insight into the amount of Darana's overcharges. In data CTC requested to claim tax credits, Darana inadvertently disclosed the hourly rates that it paid to certain subcontractors, revealing that Darana was paying some subcontractors between $21.60 and $112.50 per hour. For that same labor, however, Darana charged CTC rates ranging from $125 to $245 per hour, reflecting a markup of as much as 880%.

61.    That pattern appeared consistent across Darana's billings. Its largest labor subcontractor billed Darana on average approximately $61 per hour. Darana billed CTC for this subcontractor's labor – without disclosing that it was subcontracted labor or obtaining CTC's prior consent – at $125 to $245 per hour, representing an approximately 200% to 400% markup.

62.    Based on the information CTC has obtained to date, it estimates that Darana used subcontractors for at least 75% of the services it invoiced to CTC. CTC further estimates that

16

Darana's breach of the subcontractor markup cap led to roughly $500 to $800 million in overcharges. CTC cannot provide a more precise estimate of damages without discovery, because Darana still refuses to provide the underlying data in violation of MSA Section 9.12.

63. Darana further breached MSA Sections 2 & 4 by invoicing CTC for labor that was never performed. For example, Darana charged for some workers who logged more than 24 hours in a day and more than 168 hours in a week. Other invoices reflected double-billing for the same labor and workers billing excessive hours for travel from their home to the job site. Again, CTC does not know the full scope of such overbilling because Darana refuses to comply with its obligations to provide underlying labor data reasonably necessary to validate its invoices.

64. Before May 2026, CTC paid Darana's invoices without full knowledge of Darana's scheme to inflate labor markups or that Darana was billing for fake labor.

**B.     Darana Invoiced CTC for Unauthorized Services Unrelated to Colossus, Including Services Provided to IHRA – Violating the MSA and Cuttell's Exclusivity Agreement**

65. The Basic Information Sheets in the MSA and Amendment One established the permissible scope of Darana's work for CTC. Darana breached those provisions too. In doing so, it billed CTC for charges that had nothing to do with the data centers on which Darana was supposed to be working. Indeed, Darana and Cuttell exploited their relationship with CTC to divert funds from in-scope work to one of Cuttell's personal interests: hot rod racing.

66. Cuttell is the owner of IHRA, an organization governing motorsport competitions. CTC, xAI, and their affiliates have no connection to IHRA of any kind.

67. In violation of the MSA, Darana billed CTC for work and materials relating to IHRA, including for the Memphis Raceway. For example, Darana procured $88,000 worth of equipment like vests and safety goggles from a supplier called White Cap. The shipment was

17

sent to 8415 Firebird Drive in Hamilton, Ohio – the address for IHRA's corporate headquarters.[3] Darana then charged those supplies to CTC, even though they were not used for the data center projects and delivered no benefit to CTC.  To date, CTC has identified more than a dozen invoices that Darana improperly submitted for products and services associated with IHRA locations, including 5500 Victory Lane, 17047 Bee Line Highway, and 8415 Firebird Drive.

68.     To conceal Darana's and Cuttell's diversion of CTC resources, Darana submitted these invoices under orders for the Duke, MACROHARD, and MACROHARDER projects, making them appear as legitimate expenses.  CTC was thus duped into paying invoices, believing they were for in-scope projects rather than payments for Cuttell's and IHRA's benefit.

69.     Those unauthorized charges violated not only the MSA's prohibition on invoices for out-of-scope work, but also the amendments' exclusivity provisions.  As detailed above, Section 4 of Amendment One created an "Exclusivity Period" during which Darana "and its affiliates" agreed to "work exclusively for [CTC] for performing Services related to Data Center Infrastructure Center Projects."  By performing services unrelated to CTC's data center projects – for example, by performing services for IHRA – Darana and Cuttell violated that provision. The resulting breach forfeits Cuttell's equity incentive.  *See* Amendment Two, Ex. A ¶ 4 (stating that the award vests "if and only if" "Recipient [i.e., Cuttell] is in strict compliance with the terms of the Agreement including, without limitation, Section 2.8 (Exclusivity)").

70.     Darana further breached the MSA by using xAI trademarks in IHRA promotional materials.  Under the MSA, Darana had "no right to use any trademark or trade name of [CTC] or any affiliate [e.g., xAI]" without "prior written approval."  MSA § 8.2.  xAI LLC is a CTC

---

[3] International Hot Rod Ass'n, *Contact IHRA*, https://ihra.com/contact (last visited Aug. 2, 2026).

affiliate and owns several xAI and xAI-formative trademarks.  Darana was IHRA's major marketing partner and title sponsor.  Despite the MSA's prohibition on unauthorized trademark use, as part of its marketing efforts for IHRA, Darana and Cuttell placed xAI trademarks on IHRA promotions and apparel.

71.    IHRA personnel also publicly wore jackets bearing both IHRA and xAI trademarks during an industry event in December 2025 and at IHRA shows through at least March 2026.  xAI LLC authorized none of this, in writing or otherwise.

72.    Darana's and Cuttell's impermissible use of xAI trademarks in support of their side project with IHRA caused the harm that MSA Section 8.2 was designed to prevent. Defendants' misuse of xAI's trademarks confusingly and misleadingly implied xAI's support for, affiliation or association with, or connection to IHRA, while also generating harmful public speculation that xAI wanted to convert racetracks into data centers.[4]  Such insinuations were false.  There was and is no link between xAI and IHRA, but Darana's diversion of CTC resources to IHRA projects and misuse of xAI LLC's trademarked material for IHRA purposes created the false impression otherwise.

73.    In addition to damaging xAI's reputation, this impermissible use of xAI's trademarks allowed Darana and IHRA to generate customer interest based on the misperception of xAI's sponsorship or support, interest that allowed Darana and IHRA to obtain profits they would not otherwise have obtained.

---

[4] *See*, *e.g.*, Reddit, r/dragracing, *I Get Why People Are Skeptical of Darryl Cuttell's IHRA Ownership and Purchasing of Tracks* (May 28, 2026), https://redd.it/1tql3uq; *Racing for Land: Is IHRA's Expansion a Trojan Horse for Tech Data Centers?* (July 14, 2026), https://speedwayactionimages.com/2026/07/14/racing-for-land-is-ihras-expansion-a-trojan-horse-for-tech-data-centers/.

74.     Cuttell is personally liable under the Lanham Act for IHRA's use of xAI trademarks to buttress its business and support its activities.  He is the sole owner of IHRA and exercises full control over its activities.  On information and belief, he personally made the decision to place xAI's trademarks into IHRA branding.  He is therefore directly and vicariously liable for IHRA's repeated infringements of xAI LLC's trademarks.

### C.     Darana Breached MSA Section 9.12 by Refusing To Provide Records CTC Reasonably Requested To Validate Invoices

75.     In May 2026, CTC's concerns about Darana's misconduct were mounting.  CTC thus requested information to substantiate Darana's invoices, including all underlying invoices Darana received from the subcontractors and vendors supplying labor and materials to Colossus.  CTC requested that information to verify what downstream parties had charged to Darana and thus evaluate the extent to which Darana had applied excessive markups.  The requested information would also have allowed CTC to determine which personnel performing work on the project were Darana employees and which were subcontractors – a necessary step in validating Darana's invoices and calculating the size of the markup it had charged.

76.     Section 9.12 of the MSA required Darana to provide that information.  It provided that "[a]ll payments received pursuant to this Agreement, and Contractor's Services and workplace area and related offices shall be subject to audit and inspection by Company . . . . Contractor shall comply with all reasonable requests by Company to make available books and records necessary to substantiate Contractor's charges and invoices for reimbursement."

77.     On May 11, 2026, Darana sent CTC a letter rejecting the audit request.  Darana claimed that its ability "to disclose certain vendor pricing, subcontractor relationships, and related proprietary information remains limited due to the confidentiality obligations governing

those relationships." Darana did not cite or acknowledge MSA Section 9.12 and offered no other explanation for its refusal to provide the information CTC requested.

78. In a June 25, 2026 letter, CTC explained that Darana's refusal to provide requested data violated Section 9.12 and that its claims concerning confidentiality could not justify that refusal. CTC then reiterated its request in a June 30, 2026 email.

79. As CTC explained to Darana, its asserted "confidentiality" obligations to third parties do not absolve Darana of its duty to provide the information the MSA requires. Under Section 5.1(vii), Darana warranted that its performance under the MSA, including under Section 9.12, "will not violate any other agreement" such as purported third-party confidentiality agreements. So if Darana truly agreed to third-party confidentiality obligations that foreclosed it from complying with Section 9.12, it breached its warranty and only added to its long list of contract violations. But Darana likely never entered such an agreement regardless. On information and belief, Darana's confidentiality obligations to third parties have exceptions for information that Darana is obligated to provide under the audit procedures the MSA imposes.

80. Darana's explanations for withholding data soon shifted. Once CTC explained why the "confidentiality" excuse was baseless, Darana offered a new one. According to its latest rationale, proffered in July 2026, Darana could not provide labor data because CTC was disputing the fees Darana had charged for labor. The premise was true enough: the parties are indeed engaged in such a dispute. But Darana's conclusion was backwards. The core purpose of the audit provision is to allow CTC to obtain information necessary to validate – and dispute if necessary – the labor charges Darana billed. By withholding the data to increase its leverage in a billing dispute with CTC, Darana turned the audit provision on its head.

21

81.     As a direct result of Darana's bad-faith breach of the MSA's data-sharing provision, CTC has incurred significant legal and other expenses.  What should have been a simple exercise – receiving the data from Darana – has turned into a complicated forensic examination in which CTC's lawyers and consultants had to piece together information from other sources.  That exercise confirmed that Darana has extracted large overcharges.  But Darana's breach of its data-sharing obligations obstructed CTC from determining their full extent.  Among other things, that impediment precluded the parties from having an informed discussion to resolve this dispute without litigation.

**D.      Darana Violated Its Obligations To Conduct an Orderly Transition Following Termination**

82.     As a result of Darana's serial breaches and misconduct, CTC terminated Darana for cause on June 23, 2026.  CTC's notice of termination cited Darana's material breaches and defaults, including its violation of MSA Sections 2.1, 2.4, 4.1, 5.1, and 9.12.

83.     After CTC terminated Darana for cause, it was entitled to "withhold and offset any amount otherwise owed to Contractor to the extent reasonably necessary to compensate Company for such damages."  MSA § 7.2.  CTC estimates that Darana overcharged it by at least $500 to $800 million.  Under Section 7.2, CTC is thus entitled to withhold between $500 to $800 million that would otherwise be owed to Darana.  In a July 28, 2026 letter, Darana claimed that CTC owes $136,892,782.78 for work in Tennessee, as well as undisclosed amounts for work in Mississippi.  Because Darana has refused to provide the information CTC has requested, CTC cannot validate how much of this claimed amount might otherwise be owed.  But even if the amount were undisputed, CTC is entitled to withhold the entire amount (and more) because Darana's overcharges far exceed outstanding amounts that Darana claims it is owed.

84.    Following termination, Darana was obligated to "cooperate in the orderly wind-down of the parties' performance of this Agreement." MSA § 7.4. It has done the opposite. Instead of cooperating, it has committed further breaches and engaged in outright fraud.

85.    *First*, CTC's work on the project continues, requiring a steady flow of supplies and materials from vendors. Darana's intentional post-termination conduct has jeopardized the delivery of those supplies and materials. Darana admitted that it has not paid many of the suppliers and vendors that have provided materials to Darana for use on the project. Darana's breach of its obligations to these vendors threatens to disrupt CTC's ongoing work.

86.    Following termination, Darana fraudulently induced CTC to make a $44.39 million payment to pay specific suppliers that were critical to the project. Darana told CTC, and CTC agreed, that these suppliers needed payment because they were continuing to deliver materials for ongoing work at the data centers. For that reason, the parties agreed that CTC would make a payment to Darana that it would forward to the appropriate suppliers. Rather than follow through, Darana siphoned those funds for its own purposes.

87.    Specifically, after termination, Darana threatened CTC on June 26 and June 29 that, unless the downstream suppliers and vendors were paid, those suppliers and vendors would record mechanics' liens and file lawsuits, grinding ongoing work on the data centers to a halt. Darana also indicated that it would not itself pay any such suppliers or vendors unless CTC made additional payments. These threats implied that Darana would not fulfill its contractual duty to discharge any such subcontractor liens itself. *See* MSA § 4.2.1.

88.    During the week of July 2, 2026, CTC painstakingly validated a set of invoices for materials that had been delivered to project sites. These materials were procured by DESCO – a Darana affiliate also owned by Cuttell – from critical suppliers and vendors that were

continuing to deliver materials to CTC project sites.  CTC was able to validate a subset of charges for legitimate supplies, which it wanted to pay promptly.  CTC informed Darana that it was "prepared to pay $45M tomorrow (Thursday [July 2, 2026]) *for specific materials* the company was able to verify are legitimate," adding that "[t]hese are Desco materials."  CTC also advised that the $45 million payment was "the complete out-of-pocket cost for the materials and excludes the invoice markup."  Darana responded:  "This is agreeable."

89.     On July 2, 2026, CTC made a payment of $44,394,472.54 to Darana.  CTC followed up with specific remittance information identifying particular invoices tied to particular materials, to which the parties agreed to route the payment.  Below is a list of the invoices provided to Darana.

| Invoice No. | Invoice Description |
|---|---|
| 25-61046R | Wire (500-4/C) WE 05.09.26 |
| 25-61047 | Wire (500-4/C) WE 05.09.26 |
| 25-61048 | Wire (500-4/C) WE 05.09.26 |
| 25-61049 | Wire (500-4/C) WE 05.09.26 |
| 25-61050 | Wire (500-4/C) WE 05.09.26 |
| 25-61053 | Wire (500-4/C) WE 05.16.26 |
| 25-61054 | Wire (500-4/C) WE 05.16.26 |
| 25-61055 | Wire (500-4/C) WE 05.16.26 |
| 25-61056 | Wire (500-4/C) WE 05.16.26 |
| 25-61060 | Wire (500-4/C) WE 05.23.26 |
| 25-60018 | Duke Turbines Wire (350-3/C) WE 04.18.26 |
| 25-60019 | Duke Turbines Wire (500-3/C) WE 04.18.26 |
| 25-40069 | Wire (750-1/C) - Duke Site WE 04.25.26 |
| 25-60022 | Duke Turbines Wire (500-3/C) WE 04.25.26 |
| 25-60026 | Duke Turbines Wire (500-3/C) WE 05.02.26 |
| 25-60027 | Duke Turbines Wire (350-3/C) WE 05.02.26 |
| 25-40072 | Wire (750-1/C) - Duke Site WE 05.09.26 |
| 25-40073 | Wire (1000-1/C) - Duke Site WE 05.09.26 |

| Invoice No. | Invoice Description |
|---|---|
| 25-60030 | Duke Turbines Wire (500-4/C) WE 05.09.26 |
| 25-60035 | Duke Turbines Wire (500-3/C) WE 05.23.26 |
| 25-200294 | Wire (750-1/C) WE 06.13.26 |
| 25-200295 | Wire (1000-1/C) WE 06.13.26 |
| 25-200296 | Wire (500-4/C) WE 06.13.26 |
| 25-200297 | Wire (750-3/C) WE 06.13.26 |

These invoices totaled $44,394,472.54, after backing out Darana's 13.13% markup.

90. In follow-up calls on July 14 and July 15, 2026, CTC asked for confirmation that the funds had been or would be delivered according to these remittance instructions. Darana's counsel confirmed that Darana had already directed a portion of the payment to DESCO for payment downstream and that Darana's accounting team would direct the payment according to CTC's remittance instruction. Darana's counsel agreed to provide confirmation once the payments were issued.

91. Although Darana had promised that CTC's roughly $45 million payment would be used to pay for specific materials procured by DESCO from critical suppliers, Darana revealed on July 17, 2026 that it actually diverted the money for other purposes. When pressed, Darana admitted it had not followed CTC's remittance instructions. It further claimed that it would be impossible to trace where the money actually went. From what little information Darana did provide, it appears to have directed substantial portions of the money to 40 different hotels, both in and around Memphis and outside of Tennessee, as well as to equipment rentals and staffing agencies. Darana then requested that CTC make *additional* payments to DESCO and the critical materials suppliers that Darana had failed to pay with money CTC had paid for precisely this purpose. In a July 21, 2026 email, Darana threatened that "[m]aterials are going to

25

stop flowing to the project sites if this is not resolved." When CTC asked Darana to apply the payment CTC made on July 2 to the specified suppliers – as previously agreed – Darana refused.

92.     Darana was required to "cooperate in [an] orderly wind-down" but instead fraudulently induced CTC to make a $45 million payment that Darana misdirected to its own benefit. It then attempted to extract further payments from CTC to resolve a crisis – lack of funds flowing to critical suppliers – that Darana's own diversion of funds had caused. Thus, Darana breached MSA Section 7.4, committed fraud, breached a binding agreement about how to direct the funds, and illegally converted the funds CTC paid, while also violating the implied covenant of good faith and fair dealing.

93.     CTC is concerned that subcontractors and suppliers have not been paid. Darana is responsible for paying these entities, and its failure to do so is inexcusable. For years, CTC paid Darana's invoices that marked up material and labor costs hundreds of millions of dollars above Darana's own cost, so Darana has received more than enough to pay its vendors. After raking in CTC's money, Darana schemed to induce CTC into making an additional $45 million payment on false pretenses that the money would be used to pay those vendors. Darana's decision to divert this payment to its own purposes is causing needless disruptions to the project.

94.     CTC is attempting to mitigate this harm by working directly with vendors, but Darana is frustrating these efforts by organizing vendors to coordinate action against CTC for money *Darana* owes. This is the opposite of cooperating with CTC in an orderly wind-down.

95.     *Second*, the day after CTC terminated Darana, and without notice to CTC, Darana sent a letter to the Shelby County, Tennessee Construction Code Enforcement Action Office to request the "immediate voidance of all permits issued to Darana" at the Project Colossus and Project Tulane sites. Cuttell also "expressly direct[ed]" Ms. Anderson and her office to not

26

"reassign[ ], transfer[ ], r einstate[ ], or reissue[ ]" the permits to "any contractor, subcontractor, property owner, or other entity." An "orderly wind-down" required the efficient transfer of necessary permits, but Darana actively worked to impede such a transfer.

96. CTC subsequently applied for expedited permits to ensure that the project would not be disrupted. CTC has spent more than $8 million on these permits. These significant costs would have been avoided if Darana had cooperated with CTC to transfer – rather than immediately void – permits for an ongoing construction site.

97. *Third*, CTC received press inquiries on July 31, 2026 stating that Darana had recorded liens on CTC's properties in Memphis. Recording liens is a direct attempt to hinder the project, which is the opposite of an orderly wind-down of operations. It has further threatened that subcontractors will record liens, which Darana has the obligation to discharge under Sections 4.2 and 4.2.1 of the MSA. Indeed, Darana was required to "provide unconditional lien releases and claim waivers" with "each invoice" it submitted. MSA § 4.2. And if any subcontractor or supplier recorded "any claim or lien," Darana was obligated to "cause such lien to be discharged within three (3) business days after filing." *Id*. § 4.2.1. Darana appears intent on flouting those commitments by repeatedly threatening liens that it will not discharge.

98. Moreover, Darana has brought its dispute with CTC to the media, in breach of the MSA's confidentiality provisions. In a July 31, 2026 interview with the Daily Memphian, Cuttell revealed confidential details concerning Darana's work with CTC, including the total Darana billed, the amount CTC allegedly still owes, the amount Darana owes its vendors, the timeline for completing one of the data centers, and Darana's payment structure.[5] The MSA

---

[5] *SpaceXAI Contractor said Company Owes It $570M*, Daily Memphian (July 31, 2026), https://dailymemphian.com/section/business/article/65243/spacexai-contractor-memphis-data-center-owes-money-elon-musk

defines Confidential Information to include "all information . . . which is disclosed to or learned by [Darana] in the performance of this Agreement . . . and which relates to," among other things, "internal business information of [CTC] . . . including . . . information relating to . . . cost, rate and pricing structures, accountings, [and] financial information."  MSA § 10 (Definitions).  And the MSA prohibits Darana from "disclos[ing] . . . any Confidential Information."  By disclosing financial information such as general contractor costs and payments and pricing structures, Darana violated the MSA's prohibition on revealing Confidential Information.  Moreover, building a media campaign against CTC and denigrating CTC affiliates is inconsistent with Darana's separate contractual obligation to cooperate in an orderly wind-down of its work on CTC's projects.

## IV. DARRYL CUTTELL'S MISCONDUCT FORFEITED HIS PERFORMANCE INCENTIVES

99.     Amendments One and Two gave Cuttell personal performance incentives tied to GPU milestones.  In exchange, Darana agreed to work exclusively for CTC "performing Services related to Data Center Infrastructure Center Projects."  Amendment One ¶ 4 (adding MSA Section 2.8 "Exclusivity").

100.     The amendments also detailed when the award would vest and when it would be forfeited.  As set forth above, the award vests "if and only if (i) Recipient is in strict compliance with the terms of the Agreement including, without limitation, **Section 2.8** (Exclusivity), and (ii) Recipient continued the provision of Services for Company until the expiration of the Exclusivity Period."  Further, "[i]f such vesting conditions shall not be met," the award "will be automatically forfeited without any further action."  Amendment Two, Ex. A ¶ 4.

101.     Under the MSA and Amendments, Cuttell's award has been "automatically forfeited," Amendment Two, Ex. A ¶ 4, since neither of the two necessary vesting conditions has

28

been satisfied.  Darana was terminated for cause, and Darana and Cuttell are no longer providing

services.  Thus, the condition that "Recipient continue[s] . . . provision of Services for Company

until the expiration of the Exclusivity Period" is not satisfied.  The former condition likewise

fails because Cuttell is not "in strict compliance with the terms of the Agreement."  Darana has

serially breached the MSA *and* Cuttell and Darana provided services to IHRA, in violation of the

exclusivity provision.

**COUNT ONE**
**BREACH OF CONTRACT:  OVERBILLING**
*CTC and MZX Against Defendants Darana and Cuttell*

102.    Plaintiffs CTC and MZX incorporate the factual allegations above.

103.    The MSA, as amended, constitutes a valid and enforceable contract.

104.    The MSA permitted Darana to use subcontractors only after full disclosure to, and

prior written consent from, CTC.  MSA § 2.4.  The MSA also prohibited Darana from marking

up subcontractor labor more than 10% above Darana's costs.  MSA § 2.4.  Darana materially

breached by repeatedly utilizing subcontractor labor without prior written consent and by

marking up subcontractor labor in excess of the 10% cap allowed under the MSA.

105.    CTC and MZX suffered damages when they paid invoices submitted by Darana

that included charges for subcontractor labor that were more than 10% above the rates

subcontractors charged to Darana.

106.    The MSA's Basic Information Sheet and MSA Sections 2 and 4 permit Darana to

invoice CTC and MZX only for services actually performed.  Darana materially breached the

MSA by invoicing CTC and MZX for services that were not actually performed, including by

invoicing 24 or more hours of labor per day for certain workers who did not work – and could

not have worked – all of the hours for which CTC and MZX were charged.

29

107.    CTC and MZX suffered damages when they paid invoices submitted by Darana that included charges for labor hours that were not actually worked.

108.    When CTC and MZX paid invoices with excessive markups or inflated hours, they did not know the invoices included such overcharges.

109.    As a result of the foregoing breaches, CTC and MZX have suffered damages in excess of $75,000, as may be determined in this proceeding.  CTC and MZX estimate damages are in excess of $500 to $800 million but are unable to determine damages precisely due to Darana's breaches, including its breach of MSA Section 9.12.

## COUNT TWO
## BREACH OF CONTRACT:  OUT-OF-SCOPE WORK
*CTC and MZX Against Defendants Darana and Cuttell*

110.    Plaintiffs CTC and MZX incorporate the factual allegations above.

111.    The MSA, as amended, constitutes a valid and enforceable contract.

112.    Under the MSA, Darana was authorized to perform work for CTC and MZX data center projects only, and CTC and MZX were obligated to pay for services only in connection with applicable SOWs or purchase orders.  MSA Basic Information Sheet; Amendment One Basic Information Sheet; Amendment One § 2.8; MSA §§ 4, 4.1, 4.2.  Darana materially breached by charging CTC and MZX for work performed on and materials shipped to sites belonging to entities other than CTC or MZX, including IHRA, that was unrelated to work on data centers.

113.    CTC and MZX suffered damages when they paid invoices submitted by Darana for such out-of-scope services and materials.

114.    In connection with this unauthorized, out-of-scope work, Darana also violated MSA Section 8.2.  Under MSA Section 8.2, Darana had "no right to use any trademark or trade name of Company or any affiliate of Company."  xAI LLC is an affiliate of CTC, as CTC's sole

30

member.  Darana, through its sole owner Cuttell, breached that prohibition when it used xAI logos and trademarks during IHRA events and promotions.

115.    CTC and its affiliates suffered damages as a result of this breach, including reputational harm resulting from associating CTC's affiliates with IHRA.

### COUNT THREE
### LANHAM ACT VIOLATIONS
*xAI Against Defendants IHRA and Darryl Cuttell*

116.    Plaintiff xAI LLC incorporates the factual allegations above.

117.    Plaintiff xAI LLC is the owner of several xAI trademarks, and xAI-formative trademarks, including a federally registered, valid, subsisting United States trademark registration for "X.AI," registered in International Classes 035 and 042 (U.S. Reg. No. 5171511). xAI LLC also owns an xAI trademark, which has been applied for specifically for use in connection with t-shirts, hats, jewelry, and related merchandise (U.S. Ser. No. 99130111). Further, xAI LLC owns an xAI word mark, which has been applied for under U.S. Ser. No. 99130097.

118.    Plaintiff xAI LLC has used its xAI trademarks in commerce continuously and exclusively since at least as early as 2023.

119.    Defendants IHRA and Cuttell have used in commerce, without the permission or consent of Plaintiff xAI LLC, the xAI trademarks that Plaintiff xAI LLC owns.

120.    Defendants IHRA and Cuttell had actual knowledge of Plaintiff xAI LLC's ownership and use in commerce of Plaintiff's trademarks and, without the permission or consent of Plaintiff, have willfully and intentionally violated 15 U.S.C. § 1114.

31

121.  Defendants' use of Plaintiff xAI LLC's trademarks is likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of Plaintiff xAI LLC with Defendants in violation of 15 U.S.C. § 1114.

122.  Defendant Cuttell is vicariously liable for any and all unauthorized uses of Plaintiff xAI LLC's trademarks by Defendant IHRA.  Cuttell owns and exercises full control over IHRA, including at all times relevant to the unauthorized uses of xAI LLC's trademarks alleged herein.

123.  As a direct and proximate result of Defendants' unauthorized use of Plaintiff xAI LLC's trademarks, Defendants' actions have caused and will continue to cause reputational harm and other damages to Plaintiffs, and have unjustly enriched Defendants.

124.  Plaintiffs are entitled to all remedies available under the law, including, but not limited to, injunctive relief, compensatory damages; disgorgement of Defendants' profits; statutory damages, loss of Plaintiffs' profits, mitigation costs, and costs and attorneys' fees.

125.  The damages sustained by Plaintiffs as a result of the conduct alleged herein should be trebled in accordance with 15 U.S.C. § 1117(b).

## COUNT FOUR
## BREACH OF CONTRACT:  FAILURE TO PROVIDE DATA
*CTC Against Defendants Darana and Cuttell*

126.  Plaintiff CTC reincorporates the factual allegations above.

127.  The MSA, as amended, constitutes a valid and enforceable contract.

128.  The MSA required Darana to provide CTC data and information that CTC reasonably requested to validate Darana's invoices.  MSA § 9.12.

129.  Darana materially breached the MSA by refusing to provide data and information CTC reasonably requested to validate Darana's invoices for labor and materials, including by failing to provide underlying invoices from materials suppliers and subcontractors for labor, as

32

well as lists of Darana's employees and subcontractors who performed services billed to CTC and their rates.

130.    CTC suffered damages due to Darana's breaches, including legal expenses incurred attempting to obtain information Darana has refused to provide and costs CTC has incurred attempting to validate CTC invoices with incomplete data.

**COUNT FIVE**
**BREACH OF CONTRACT:  MISAPPROPRIATION OF**
**POST-TERMINATION PAYMENTS**
*CTC and MZX Against Defendants Darana and Cuttell*

131.    Plaintiffs CTC and MZX incorporate the factual allegations above.

132.    The MSA, as amended, constitutes a valid and enforceable contract.

133.    MSA Section 7.4 required Darana to cooperate in an orderly wind-down of operations.

134.    Darana materially breached the MSA by inducing CTC and MZX to make a $44.39 million payment after termination, and then diverting the payment to its own purposes. CTC and MZX made the payment – and Darana agreed the payment was made – to ensure that critical materials suppliers, which are providing materials for ongoing work at the data center sites, did not record liens or file lawsuits, cut off the flow of materials to the project, or otherwise disrupt ongoing operations.  Rather than directing the funds to these critical suppliers as required to ensure an orderly transition of the project following termination, Darana diverted the funds to pay other obligations Darana itself owed that were not critical to ongoing operations and that were inconsistent with the parties' agreement concerning the payment.

135.    In addition to breaching MSA Section 7.4, this also violated the parties' separate July 2, 2026 agreement concerning direction and use of the $44.39 million payment.  The parties' agreement in writing that the payments were for specific materials was a valid and

33

enforceable contract.  And Darana breached by diverting the payment to purposes other than the specific materials agreed upon between the parties.

136.    In the alternative, Darana's conduct violated the implied covenant of good faith and fair dealing.  Darana's conduct was inconsistent with the parties' reasonable expectations under the MSA and their separate agreement concerning the July 2, 2026 payment, and prevented CTC and MZX from receiving the benefits thereof.  Specifically, CTC and MZX contracted to obtain, and paid to secure, the ongoing supply of materials from vendors and suppliers that Darana had not paid, and Darana deprived CTC and MZX of that benefit by directing the $44.39 million July 2, 2026 payment to other purposes.

137.    CTC and MZX have suffered damages as a result of Darana's breach, including the costs of paying suppliers directly for materials CTC and MZX already paid for on July 2, 2026.

**COUNT SIX**
**CONVERSION**
*CTC and MZX Against Defendants Darana and Cuttell*

138.    Plaintiffs CTC and MZX incorporate the factual allegations above.

139.    After CTC terminated Darana for cause, Darana induced CTC and MZX to make a $44,394,472.54 payment in order to pay downstream suppliers and vendors and thereby avoid disruption to ongoing work.

140.    In entrusting this determinate sum to Darana, CTC and MZX gave specific instructions on the purpose of the payment.  CTC and MZX instructed Darana to use the payment to pay specific suppliers that were critical to the project.

141.    Instead, Darana converted the $44,394,472.54 payment, appropriating it for Darana's own use and benefit.

34

142. Notwithstanding CTC and MZX's specific instructions, Darana intentionally exercised dominion over the payment by choosing to direct the payment to its own purposes instead. Darana thereby defied CTC and MZX's explicit instructions and its right to control the purpose of the payment.

143. Darana committed its conversion of CTC and MZX's payment with intent, fraud, malice, insult, ill will, recklessness, or willful or conscious disregard of CTC and MZX's rights, entitling CTC and MZX to punitive damages.

## COUNT SEVEN
## UNJUST ENRICHMENT
*CTC and MZX Against All Defendants*

144. Plaintiffs CTC and MZX incorporate the factual allegations above.

145. Darana's above actions, to the extent not covered by the MSA, caused CTC and MZX to lose the financial benefit of the amounts that CTC and MZX paid to Darana above what CTC and MZX were contractually required to pay as a result of Darana's illegal, unfair, deceptive, and/or fraudulent conduct.

146. In doing so, Darana was unjustly enriched at the expense of and to the detriment of CTC and MZX.

147. Darana was unjustly enriched, *inter alia*, in the following ways:

    a. By charging CTC and MZX, and accepting payment for, amounts in excess of those to which it was legally entitled.

    b. By charging CTC and MZX, and retaining payments for, work performed on non-CTC and MZX sites.

    c. By inducing CTC and MZX to make a $44.39 million payment for specific materials suppliers and then diverting those funds to its own purposes.

148.   Allowing Darana to retain the payments it received from CTC and MZX for any such conduct would be inequitable, unconscionable, and against public policy.

149.   As a direct and proximate result of Darana's conduct, CTC and MZX have been damaged and are entitled to restitution and interest in an amount to be determined at trial, disgorging all monies paid to Darana as a result of Darana's illegal, deceptive, unfair, and/or fraudulent practices.

150.   CTC and MZX have no adequate remedy at law for these amounts.

### COUNT EIGHT
### FRAUD
*CTC and MZX Against Defendants Darana and Cuttell*

151.   Plaintiffs CTC and MZX incorporate the factual allegations above.

152.   Darana committed actionable fraud against CTC and MZX through affirmative misrepresentations and the concealment of material facts.  For example:

   a.   Darana affirmatively misrepresented that work was performed by Darana employees when it was in fact performed by subcontractors.

   b.   Darana affirmatively misrepresented that work was performed for the benefit of CTC and MZX sites when it was in fact performed for the benefit of other entities.

   c.   Darana affirmatively misrepresented that a $44.39 million payment made by CTC and MZX on July 2, 2026 would be used to satisfy invoices for materials to particular suppliers when in fact Darana applied the payment to other purposes.

153.   Darana also made or approved materially false and misleading statements to CTC and MZX when it contracted to perform the services under the MSA as amended.

154.   These false statements and misrepresentations were material.

155.   These false statements and misrepresentations were false when made.

156.   Darana made the foregoing false statements and misrepresentations that omitted and concealed material facts knowingly and/or recklessly despite being aware of their falsity.

157.   CTC and MZX reasonably and actually relied on Darana's misrepresentations and concealments.

158.   As a direct and proximate result of such unlawful conduct, CTC and MZX have suffered, and will continue to suffer, damages in an amount to be proven at trial.

159.   Darana's acts were undertaken intentionally and in conscious disregard of CTC and MZX's rights, and were malicious, fraudulent, and oppressive.

160.   CTC and MZX are entitled to damages and should be awarded exemplary and punitive damages in an appropriate amount to punish Darana and to deter similar fraudulent conduct in the future.

**COUNT NINE**
**BREACH OF CONTRACT:  ORDERLY WIND-DOWN**
*CTC and MZX Against Defendants Darana and Cuttell*

161.   Plaintiffs CTC and MZX incorporate the factual allegations above.

162.   The MSA, as amended, constitutes a valid and enforceable contract.

163.   MSA Section 7.4 required Darana to cooperate in an orderly wind-down of operations.

164.   Darana materially breached the MSA by canceling and seeking to prevent the transfer of permits necessary for ongoing operations on the data center project, instead of working with CTC to transfer them.  Darana also materially breached by filing liens against CTC properties and attempting to create negative publicity against CTC and MZX in the press.

37

165.    CTC and MZX suffered damages as a result of Darana's breach, including spending more than $8 million to renew the permits on an expedited basis that would not have been required if Darana had worked with CTC to transfer them.

## COUNT TEN
## DECLARATORY JUDGMENT
*CTC and MZX Against Defendants Darana and Cuttell*

166.    Plaintiffs CTC and MZX incorporate the factual allegations above.

167.    A real and actual controversy exists regarding the parties' rights and obligations under the MSA concerning:  (1) CTC and MZX's right to retain all amounts withheld pursuant to MSA Section 7.2 as compensation for Darana's breaches; and (2) the forfeiture of Darryl Cuttell's equity incentive award pursuant to Amendment Two.

168.    This action is not "premature."  Certain issues in dispute are currently appropriate for judicial interpretation and determination, including CTC and MZX's right to withhold amounts otherwise due to compensate for damages caused by Darana's breaches and whether Darana and Cuttell have irrevocably failed to satisfy conditions necessary to obtain the incentive award.  Substantial potential financial burdens and losses are a real and existing threat to CTC and MZX as herein alleged.

169.    CTC, MZX, Darana, and Cuttell have substantial need to know their respective rights and obligations under the MSA, as amended.

170.    CTC and MZX are entitled to a declaration (1) that they were entitled to terminate the MSA for cause pursuant to MSA Section 7.2; (2) that they are entitled to permanently withhold amounts retained pursuant to MSA Section 7.2 to compensate for losses caused by Darana's breaches and that Darana is not entitled to any further payment under the MSA; and (3) that Recipient Darryl Cuttell's equity incentive award under Amendments One and Two is forfeited.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs xAI LLC, CTC, and MZX respectfully pray for judgment against Defendants as follows:

    (a)    Compensatory damages in an amount to be proven at trial, estimated to be $500 million or more;

    (b)    Mitigation costs;

    (c)    Punitive damages;

    (d)    Injunctive relief as set forth in Count Three;

    (e)    Statutory damages as set forth in Count Three;

    (f)    Pre-judgment interest at the applicable rate from the date of Defendants' breach;

    (g)    Post-judgment interest at the rate provided by 28 U.S.C. § 1961;

    (h)    Attorneys' fees and expenses;

    (i)    Costs of suit;

    (j)    Declaratory Judgment as set forth in Count Ten; and

    (k)    Such other and further relief as this Court deems just and proper.

DATED:  August 4, 2026

Respectfully submitted,

*/s/ Daniel W. Van Horn*

Daniel W. Van Horn (BPR 018940)
Kathryn K. Van Namen (BPR 031322)
Andrew B. Schrack (BPR 037624)
BUTLER SNOW LLP
6075 Poplar Avenue, Suite 500
Memphis, TN 38119
Tel.: (901) 680-7200
Fax: (901) 680-7201
Danny.VanHorn@butlersnow.com
Kate.VanNamen@butlersnow.com
Andrew.Schrack@butlersnow.com

Joshua D. Branson (*PHV* application forthcoming)
Andrew C. Shen (*PHV* application forthcoming)
Matthew M. Duffy (*PHV* application forthcoming)
Dennis D. Howe (*PHV* application forthcoming)
Ryan M. Folio (*PHV* application forthcoming)
Stephanie E. Levin (*PHV* application forthcoming)
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Office: (202) 326-7900
Fax: (202) 326-7999
jbranson@kellogghansen.com
ashen@kellogghansen.com
mduffy@kellogghansen.com
dhowe@kellogghansen.com
rfolio@kellogghansen.com
slevin@kellogghansen.com

*Counsel for Plaintiffs x.AI LLC, CTC Property LLC,
and MZX Tech LLC*

101974212.v1

40