**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | |
|---|---|
| X.AI LLC, CTC PROPERTY LLC, and MZX TECH LLC,<br><br>Plaintiffs,<br><br>v.<br><br>DARANA HYBRID, INC., CUTTELL MOTORSPORTS, LLC d/b/a INTERNATIONAL HOT ROD ASSOCIATION, and DARRYL CUTTELL,<br><br>Defendants. | Civil Action No. 2:26-cv-02994<br>Judge Brian C. Lea |
| DARANA HYBRID, INC.,<br><br>Counterclaim Plaintiff,<br><br>v.<br><br>CTC PROPERTY LLC and MZX TECH LLC,<br><br>Counterclaim Defendants. | |

**AMENDED COMPLAINT**

Plaintiffs x.AI LLC ("xAI LLC"), CTC Property LLC ("CTC"), and MZX Tech LLC ("MZX"), for their Amended Complaint against Defendants Darana Hybrid, Inc. ("Darana"), Cuttell Motorsports, LLC d/b/a International Hot Rod Association ("IHRA"), and Darryl Cuttell, state as follows:

## INTRODUCTION

1. This lawsuit concerns a general contractor that overbilled and defrauded its client while building artificial-intelligence supercomputing facilities in and around Memphis, Tennessee. Plaintiff CTC owns the supercomputing facilities.[1] Defendant Darana – controlled by its owner, Defendant Darryl Cuttell – was the general contractor that oversaw construction.

2. Darana and Cuttell overbilled CTC by hundreds of millions of dollars while selling out their own suppliers and subcontractors along the way. They breached their contract with CTC, secretly marked up subcontracted labor well beyond the contractual cap, and diverted money to Cuttell's personal side projects. Throughout, Cuttell used a web of affiliated subcontractors and suppliers to implement his scheme and conceal the rampant overcharging.

3. The parties' contract (the Master Services Agreement, or "MSA") allowed Darana to use subcontracted labor only if it met certain conditions. Most notable was a negotiated ceiling on Darana's markups: the contract capped those markups at 10% over the amount that the subcontractors charged to Darana. Darana violated that cap and billed CTC at markups as high as 880%. CTC estimates that these overcharges alone amount to at least $500-$800 million.

4. At the same time Defendants were overcharging CTC, they were refusing to pay their own vendors while siphoning off CTC's funds to promote Cuttell's side projects. Hot rod racing was perhaps the most egregious. Cuttell owns an international racing association, and he saw in the Memphis project a way to fund his racing ambitions at CTC's expense. Darana charged CTC for unauthorized, out-of-scope work on hot rod projects, including the construction of a local raceway that had nothing to do with the supercomputing facilities CTC had hired

[1] The projects contemplated by and performed under the parties' contract were often called AI "data centers." For purposes of this Amended Complaint, Plaintiffs use the term "supercomputing facilities" or "supercomputers" interchangeably with "data centers."

Darana to build. Defendants not only billed CTC for their work on the raceway but also misappropriated trademarks to market their unrelated projects for their own benefit.

5. When CTC discovered Defendants' rampant overcharging, it terminated Darana for cause. Unfortunately, that termination only caused Darana to escalate its misconduct. To gain leverage in its billing dispute with CTC, Darana withheld tens of millions of dollars it owes to the very subcontractors and suppliers it hired and oversaw. Many are local businesses that remain vital to ongoing construction at the supercomputing facility sites. The MSA requires Darana to pay them. Yet Darana is refusing to comply and is pointing the finger at CTC instead.

6. CTC has tried to do right by those vendors. Although CTC was not required to pay Darana another dollar given the scale of Darana's cheating under the contract, it recently wired Darana $45 million on Darana's promise that critical downstream suppliers would receive the money Darana owed them. Darana promised to earmark CTC's payment for those vendors and told CTC it would disburse the funds to them. It diverted the money instead. Worse, Darana tried to blame CTC, telling its vendors that CTC was the one causing them not to be paid.

7. CTC has already paid Darana more than enough for Darana to honor its commitments to its vendors. Having siphoned the money, however, Darana now refuses to follow through. Rather than pay its vendors, Defendants are blaming the victim of their overcharges and urging their vendors to take action against CTC. Those improper threats are imperiling construction and flout Darana's duty to ensure an orderly wind-down of its work.

8. Darana did all this to cover up its own massive breach of contract and theft of CTC's money. Even aside from Darana's shameful treatment of its own vendors, there was barely a section of the MSA with which it managed to comply. Its impermissible markups and out-of-scope work were the most egregious violations. But others abounded. For example,

Defendants charged CTC for phantom labor, flouted their exclusivity commitments, and unlawfully revoked key permits. They further misled CTC by misdescribing their work and withholding key billing data the contract required them to supply. And when CTC exercised its contractual right to audit Darana's payment records, Darana simply refused to produce them. All told, these serial contract breaches have inflicted upwards of $800 million in damages.

9. After CTC filed this action, Darana breached the contract yet again. The MSA contains a mandatory forum-selection clause requiring the parties to litigate all their disputes in Memphis, Tennessee. Yet soon after CTC brought this case in Memphis, Darana responded by filing suit in Mississippi state court for hundreds of millions of dollars of work under the MSA. It sought to evade the forum-selection clause by omitting mention of the MSA and claiming falsely that it had performed in Mississippi under a separate "verbal agreement." That maneuver has driven up CTC's litigation costs and subverted the forum-selection clause's core purpose: to funnel all disputes related to the MSA into a predictable, centralized forum. Darana's breach has already forced CTC to incur extra burden and attorney's fees to litigate in two forums.

10. Cuttell is personally liable for all this misconduct. Although Darana was nominally the entity that breached the parties' contract, Cuttell accomplished the breach by disregarding corporate formalities. Indeed, Cuttell controls a web of some 60 affiliated entities that share offices, employees, email addresses, and lawyers. And that web of entities – separate in theory but fused in practice – was vital to his overbilling scheme. At Cuttell's direction, Darana often sourced labor or supplies from other downstream Cuttell-controlled businesses, allowing Cuttell to extract a markup at every link in the chain. The maze of affiliations also allowed him to exploit Darana's relationship with CTC to siphon CTC's funds away to IHRA and other parts of Cuttell's sprawling business empire. None of this was an accident. As shown

by the relevant corporate registrations and confirmed by Cuttell's conduct in this case, his various corporate entities are constituent parts of a unitary enterprise subject to his ultimate control. Darana was merely the corporate instrument through which he stole CTC's money.

11. CTC tried to resolve this dispute without litigation. Indeed, CTC appreciates the hard work that the subcontractors and suppliers have put into making these supercomputing facilities a success. It wants all innocent vendors to be paid, and in some cases, has already paid them directly. But ultimately, these payments are *Darana's* responsibility. If CTC gives Darana money for such vendors, Darana has demonstrated it will simply pocket the funds – all so Cuttell can continue to enrich himself at the expense of everyone else involved in the project.

12. CTC is left with no other choice. It brings this suit to remedy Defendants' ongoing misconduct and recover the money they stole from both CTC and their own vendors.

## THE PARTIES

13. Plaintiff x.AI LLC ("xAI LLC") is a limited liability company organized under the laws of Nevada. Its principal place of business is in Texas. It is managed by its sole member, x.AI Corp. ("xAI"), which is a Nevada corporation with a principal place of business in Texas. Therefore, for purposes of diversity jurisdiction, xAI LLC is a citizen of Nevada and Texas.

14. Plaintiff CTC Property LLC ("CTC") is a limited liability company organized under the laws of Wyoming and managed by its sole member, xAI LLC, which is a citizen of Nevada and Texas. CTC is therefore also a citizen of Nevada and Texas.

15. Plaintiff MZX Tech LLC ("MZX") is a limited liability company organized under the laws of Wyoming and managed by its sole member, CTC, which is a citizen of Nevada and Texas. MZX is therefore also a citizen of Nevada and Texas. CTC often used MZX to pay for services performed on the supercomputing facility projects relevant to this case, and when MZX took action to pay for or receive services related to the MSA, it did so on CTC's behalf and

subject to CTC's control. MZX therefore falls within the MSA's definition of "Party" or "Parties," which are defined to include "Company [CTC], Contractor, and their respective representatives, agents, employees, officers, directors or contractors, or subcontractors."

16. Defendant Darana Hybrid, Inc. ("Darana") is a Tennessee corporation that maintains its principal place of business in Ohio. For purposes of diversity jurisdiction, Darana is a citizen of Tennessee and Ohio. Darana maintains an office and conducts business in Shelby County, Tennessee, within the Western Division of this District. Darana can be served through its Registered Agent, Cogency Global Inc., at 992 Davidson Drive, Suite B, Nashville, Tennessee 37205-1051.

17. Defendant Cuttell Motorsports, LLC d/b/a International Hot Rod Association ("IHRA") is a limited liability company organized under the laws of Ohio, with its principal place of business in Ohio. Upon information and belief, Cuttell Motorsports, LLC is managed by its sole member, Darryl Cuttell, who is a citizen of Ohio. Therefore, IHRA is also a citizen of Ohio. IHRA can be served through its registered agent, C T Corporation System, at 300 Montvue Road, Knoxville, Tennessee 37919-5546.

18. Defendant Darryl Cuttell is a citizen and resident of Ohio. Cuttell can be served at 345 High Street, Suite 510, Hamilton, Ohio 45011. Cuttell is the sole owner of both Darana and IHRA.

## JURISDICTION AND VENUE

19. The Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1) because this is a civil action between citizens of different States and because the amount in controversy exceeds $75,000, exclusive of interest and costs. The Court also has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff xAI asserts claims under the Lanham Act, 15 U.S.C. § 1051, and supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367.

20. The Court has personal jurisdiction over Darana because it is incorporated in Tennessee. Darana purposefully transacted business in Tennessee, including through its construction of supercomputing facilities near Memphis, and the claims asserted in this action arise out of or relate to those transactions. Darana also consented to personal jurisdiction by agreeing that disputes arising out of the MSA must be brought in Tennessee. *See* MSA § 9.17.

21. Cuttell purposefully transacted business in this District, including in his business dealings with CTC through Darana in connection with the construction of supercomputing facilities near Memphis. CTC's claims against Cuttell arise out of or relate to those contacts.

22. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, including the events detailed below concerning supercomputing facility construction projects in and around Memphis. Venue is also proper because a substantial part of the property that is the subject of this action is situated in this District, and because Darana consented to venue in this District by agreeing that disputes arising out of the MSA "shall" be litigated in "the appropriate court of law located in Memphis, Tennessee." MSA § 9.17.

23. Under Local Rule 3.3 and 28 U.S.C. § 123(c)(2), this action is properly filed in the Western Division of the United States District Court for the Western District of Tennessee because the claim arose, the events complained of occurred, and/or the property at issue is located in Shelby County, which is within the Western Division. In addition, Section 9.17 of the MSA states that the "parties hereby agree that should litigation be necessary, the forum for said litigation shall be the appropriate court of law located in Memphis, Tennessee."

## FACTUAL ALLEGATIONS

### I. CTC BEGINS CONSTRUCTING A NETWORK OF SUPERCOMPUTING FACILITIES IN THE GREATER MEMPHIS AREA

24. CTC's parent company, xAI, was founded in 2023 to "[a]ccelerate human scientific discovery."[2] xAI creates "[f]rontier reasoning, real-time voice, and generative media—designed to extend what humanity can know and do." xAI's premier product is Grok, an artificial-intelligence assistant. Since its founding, xAI has grown from a startup with a handful of researchers to one of the world's most innovative AI labs. It provides leading AI models, computing infrastructure, and developer tools to power commercial expansion.

25. xAI's cutting-edge AI models require significant computing power. To that end, CTC set out to construct a fully functional, single-connected AI training cluster in Memphis, powered by the world's most powerful supercomputer. CTC calls this project "Colossus."

26. CTC selected an abandoned Electrolux factory in South Memphis as Colossus's future home and broke ground in May 2024. Local leaders hailed Colossus as "[Memphis's] defining moment,"[3] and the project gained popular support. In breaking ground on Colossus, CTC made a large capital investment in the local community, committed to build a wastewater recycling facility, and employed many local workers while creating new jobs. Memphis leaders thus welcomed CTC's development in the "Digital Delta."

27. CTC and MZX subsequently expanded their work in the Greater Memphis area to include additional supercomputing facilities – Macrohard and Macroharder – and power generation at a former Duke Energy plant site in Southaven, Mississippi. For the Mississippi

---

[2] xAI, *About*, https://x.ai/company (last visited Aug. 2, 2026).

[3] Greater Memphis Chamber, *xAI Memphis Announces Expansion of Supercomputer with Addition of Tech Companies in Digital Delta* (Dec. 4, 2024), https://perma.cc/5WP5-HDZK.

component of the project, CTC often used its subsidiary and agent MZX as the entity that supervised and paid for work on the supercomputing facilities.

## II. CTC ENTERS A MASTER SERVICES AGREEMENT WITH DARANA FOR CONSTRUCTION OF COLOSSUS

28. CTC selected Darana as the prime contractor for electrical and mechanical services on its projects in the Greater Memphis area. Darana is a Hamilton, Ohio-based electrical and mechanical contractor and subcontractor. It has been in business since 1985.

### A. The Master Services Agreement

29. CTC and Darana negotiated a Master Services Agreement ("MSA") to govern Darana's work on Colossus. The MSA is attached as Exhibit 1. The MSA took effect on April 15, 2024 and was fully executed on August 5, 2024. It lists CTC as the "Company" and Darana as the "Contractor." It contains these key provisions, among others:

30. **Scope of Work.** The MSA restricted the scope of Darana's work and barred Darana from billing for work outside that scope. It first attached a "Basic Information Sheet" supplying the initial parameters for Darana's work. The Basic Information Sheet specified that Darana should work on "Project Colossus." For the "Price" and "Invoice" requirements governing that work, it incorporated the terms set forth in future "Statement(s) of Work."

31. Section 4 of the MSA described those statements of work ("SOWs"), mandating that the "applicable SOW shall set forth the fees and charges that [CTC] shall be obligated to pay for or in connection with the Services" Darana performed. The same provision conditioned CTC's payment obligation on the existence of an agreed SOW. It left no doubt about what would happen if Darana performed work outside an SOW: "[a]ny Work performed by [Darana] unless pursuant to a SOW shall have been done solely at [Darana]'s risk, and [Darana] hereby

waives and shall not make any claims, including those for unjust enrichment or *quantum meruit*, based on performance of Work that has not been authorized in writing by [CTC]."

32. The MSA created one narrow carveout to the SOW requirement, for Purchase Orders. Under Section 9.3, which was the MSA's integration clause, "Purchase Orders between the Parties entered into prior to execution of this Agreement shall be treated as SOWs." So if the parties entered a purchase order, the contract treated that purchase order as an SOW that satisfied the MSA's precondition for payment. Without a valid purchase order, however, Darana was required to submit an agreed-on SOW before seeking payment under the MSA.

33. The rest of section 9.3 fully integrated the MSA as constituting "the entire understanding and agreement of the parties related to the subject matter hereof and supersedes and replaces any and all prior or contemporaneous discussions, agreements and understandings regarding such subject matter." In addition, the parties agreed that the MSA could only be changed "by a written document signed by authorized representatives of [CTC] and [Darana]. No course of dealing or course of conduct shall operate to modify this Agreement." MSA § 9.6.

34. The MSA further clarified that Darana was waiving its right to payment for out-of-scope work "notwithstanding any course of dealing between the parties or any implied acceptance of any Work by Company." MSA § 4. The term "Work," in turn, was defined as "any services or work that Contractor provides pursuant to the terms of this Agreement or any SOW." MSA § 10. Together, those provisions required Darana to disclose and obtain approval before commencing work that could be charged to CTC. Unless and until Darana provided an approved SOW governing each type of work, CTC had no duty to pay Darana anything.

35. **Subcontractor Markup Cap.** On top of the protections conferred by the required SOWs, CTC also bargained for a cap on Darana's ability to mark up subcontracted

labor and materials. Section 2.4 allowed Darana to use subcontractors on the project, but "only upon Company's prior written consent." It similarly allowed Darana to contract with suppliers to source materials for the project. But in both cases, it limited Darana's markup to 10%. Section 2.4 stated that, "[i]n the event [Darana] performs Services through subcontractors or purchases material and equipment from suppliers, [Darana's] markup shall be stated in a SOW, and shall not exceed ten percent (10%)."

36. **Invoicing.** The MSA also established an invoicing process. Under Section 4.1, CTC agreed to pay invoices "not reasonably disputed" within 45 days. At the same time, that provision allowed CTC to withhold disputed payments. It gave CTC "the right to withhold any payments, or portions thereof, otherwise due for (i) unsatisfactory progress or performance of Services, (ii) [Darana's] failure to satisfy any payment obligations in relation to the Services; (iii) any damages or set-offs incurred by [CTC] with respect to the applicable SOW, or (iv) to offset payments previously made for unsatisfactory Services against future amounts owing under an applicable SOW, until such Services are performed to [CTC's] satisfaction."

37. The MSA also preserved CTC's flexibility to pay disputed amounts without affecting its broader rights. Even if CTC chose to pay disputed amounts under Section 4.2, that choice did not prejudice its right to dispute and recover those amounts later. As the contract made clear: "[n]o payment hereunder shall constitute acceptance or approval of any services."

38. **Audit Rights.** To ensure that CTC had full information about the project and Darana's charges, the MSA also gave CTC robust audit rights. In Section 9.12, Darana agreed that "[a]ll payments received pursuant to this Agreement, and [Darana's] Services and workplace area and related offices shall be subject to audit and inspection by [CTC] or any authorized representatives acting on [CTC's] behalf." Beyond that broad audit right, the MSA required

Darana to provide information needed for CTC to validate its invoices: "[Darana] shall comply with all reasonable requests by [CTC] to make available books and records necessary to substantiate [Darana's] charges and invoices for reimbursement." MSA § 9.12.

39. **Intellectual Property Protections.** To protect CTC, xAI LLC, and their affiliates from misuse of their trademarks and trade names, the MSA also stated that, "[w]ithout [CTC's] prior written approval, [Darana] shall have no right to use any trademark or trade name of [CTC] or any affiliate of [CTC]." MSA § 8.2.

40. Further, the MSA confirmed that intellectual property developed during the project belonged to CTC and could not be retained or used by Darana after termination. Specifically, Section 8.3 provided: "All documents (including drawings, plans and specifications) furnished by [Darana] pursuant to this Agreement are the instruments of service to the Project, and [CTC] shall retain all common law, statutory and other reserved rights in such documents, including intellectual property and copyright." More broadly, "[a]ll Confidential Information, regardless of form, shall be the property of [CTC] or the applicable affiliate of [CTC], and shall be returned to [CTC] or the applicable affiliate at the expiration or earlier termination of this Agreement." MSA § 8.1.2.

41. **Termination.** The MSA granted CTC the right to terminate with or without cause. Under Section 7.1, CTC had the absolute, discretionary right to terminate the MSA "at any time, for its convenience and without cause."

42. Under Section 7.2, CTC also had the right to terminate "as a result of a breach or default by" Darana. If CTC terminated Darana due to a breach or default, CTC had the right to withhold all further payment – even as to otherwise-undisputed amounts – if reasonably necessary to compensate for the breach. Section 7.2 stated: "In the event [CTC] terminates this

Agreement or any SOW as a result of a breach or default by [Darana], [Darana] shall remain liable to [CTC] for any and all damages incurred or suffered by [CTC] as a result of such breach or default; and [CTC] may, in addition to any other rights and remedies provided herein, or at law or in equity, withhold and offset any amount otherwise owed to [Darana] to the extent reasonably necessary to compensate [CTC] for such damages."

43. The parties further agreed that, after termination, Darana "shall cooperate in the orderly wind-down of the parties' performance" of the MSA. MSA § 7.4.

44. **Forum Selection Clause.** The MSA includes a broad forum selection clause: "The parties hereby agree that should litigation be necessary, the forum for said litigation shall be the appropriate court of law located in Memphis, Tennessee." MSA § 9.17. This clause requires that any litigation between the parties – including Darana, CTC, and "agents" like MZX, *id.* § 10 (definition of "Parties") – proceed solely in Memphis.

**B. First Amendment to the MSA**

45. In April 2025, the parties amended the MSA, expanding the scope of Darana's work to include additional supercomputing sites and granting Cuttell an equity incentive that would vest if certain conditions were satisfied. They memorialized those terms in MSA Amendment Number One ("Amendment One"), which is attached as Exhibit 2. It took effect on April 12, 2025.

46. Amendment One's scope was limited. Section 8 emphasized that, "[e]xcept as amended hereunder, all terms of the Agreement remain unmodified and in full force and effect and nothing in the Agreement is modified by this Amendment by implication or otherwise."

47. **Covered Projects and Services.** Amendment One modified the Basic Information Sheet's description of the "Project where Services will be performed" to include "Project Colossus" on Paul R. Lowry Road in Memphis, and "Project Tulane," on Tulane Road

in Memphis. Amendment One ¶ 1. It also specified that "[a]dditions . . . to the Project and Services may [be] accomplished by Statements of Work and/or Purchase Orders." *Id.* The parties, including CTC, MZX, and Darana, subsequently expanded the project via purchase orders to include work for MZX, including at Macrohard in Tennessee, and at Macroharder and the former Duke Energy plant in Mississippi.

48. In a lawsuit arising from this work, which Darana improperly filed in Mississippi state court, Darana erroneously claimed that its work for MZX on datacenters in Mississippi was performed not under the MSA but under a "verbal agreement" with Christian Kauffman, an xAI employee in Accounts Payable. However, Darana's conduct made clear that it understood the MSA to govern its work on sites in Mississippi. After executing Amendment One, Darana repeatedly invoiced CTC for work performed at (and materials delivered to) the "Macroharder" supercomputing facility sites in Mississippi, including 2875 Stanton Road South, in Southaven, Mississippi, and 7700 Nail Road, in Olive Branch, Mississippi.

49. Both the addresses and the rates reflected in the invoices confirmed Darana's understanding that the MSA governed Darana's work in Mississippi. One such invoice was Darana Invoice #25-40016, which listed "CTC Property LLC" in the "Bill To" field. The "Project" field listed "25-400(E) Duke Site," with the 2875 Stanton Road address. The invoice was dated September 1, 2025, and billed CTC $485,800.00 for "T&M Labor Hours Billed Weekly." That figure arose from the MSA: Darana calculated the total charge at the then-prevailing $200/hour rate for labor under the MSA's Amendment One, reflecting the parties' expectation that the MSA would govern. Darana billed many such invoices to CTC, reflecting the expansion of the parties' contractual arrangement to the Mississippi sites. These invoices were later paid with Purchase Orders that effectuated "[a]dditions . . . to the Project and

Services" under Amendment One to the MSA covering the Duke and Macroharder sites (such as Purchase Orders 103756, 103757, 103758, 104498, 104218, 104228, 104508).

50. Several of Darana's invoices referenced CTC and MZX together. For example, Darana Invoice #26-19517 billed CTC $243,200.00 for "T&M Labor Hours Billed Weekly." While the "Bill To" field listed "CTC Property LLC," the "Project" field contained the following address: "MZX Tech LLC, c/o Darana Hybrid Inc., 2875 Stanton Rd, Southaven, MS 38671." Other Darana invoices, including invoices for the separate 7700 Nail Road site, also listed "CTC Property LLC" in the "Bill To" field alongside "MZX Tech LLC" in the address line of the "Project" field. These invoices reflected the mutual understanding that, while MZX was responsible for certain work in Mississippi, this phase of the project was a continuation of work that Darana and CTC had commenced in Tennessee, all subject to the MSA as amended.

51. In or around January 2026, Christian Kauffman of xAI (parent of both CTC and MZX) instructed Darana to begin invoicing MZX, rather than CTC, for work performed by Darana at the Mississippi sites. That instruction reflected CTC's decision to use MZX as its Mississippi agent for the supercomputing facility projects. The same CTC personnel managed MZX's billing and payments, and when MZX paid Darana's invoices, it did so at CTC's direction and subject to its control.

52. Kauffman did not enter any "verbal agreement" with Darana to extend or alter the scope of Darana's work. He had no authority to do so, and Darana had no reason to believe he had any such authority. Kauffman, who worked in Accounts Payable, routinely interacted with Darana for purposes of processing Darana's invoices for ongoing work on the supercomputing facility projects. His role for CTC and MZX related to financial and accounting aspects of the supercomputing facility construction projects covered by the MSA.

53. By contrast, when the parties negotiated the terms of the MSA and later Amendments, Darana negotiated with xAI's Procurement and Engineering teams, including Tiffany Wilson-Vargas. Kauffman was not involved in negotiation of the MSA or any of the amendments. Darana could not have reasonably understood Kauffman's billing-related instruction to constitute a new contract separate from the MSA. No member of the negotiation team was involved in the billing logistics issues Kauffman discussed with Darana.

54. On January 12, 2026, Brandy Petrak, Senior Accountant at Darana, emailed Kauffman and others with four invoices billed by Darana to CTC. The invoices were sent to the email address billing@colossusx.com, a reference to the "Project Colossus" referenced on the cover page and the Basic Information Sheet of the MSA as the "Project where Services will be performed." Petrak's email, which copied Kauffman and various xAI and Darana employees, bore the subject line "Stateline Invoices WE 01.10.26," and referenced "invoices attached for GXO/Stateline, week ending 01.10.26." The reference to "Stateline" was a reference to "Project Stateline," a.k.a. Macroharder—an expansion of the parties' work under the MSA to an additional supercomputing facility located at 2400 Stateline Road in Southaven, Mississippi. Petrak's email reflected Darana's understanding that the work at the Stateline site in Mississippi was governed by the same MSA as Project Colossus in Tennessee.

55. A few hours after Petrak sent her email, Kauffman responded to reiterate his request that Darana bill Mississippi work under the MSA to MZX, asking Petrak to "please reissue Stateline invoices to MZX Tech LLC." Petrak followed up asking Kauffman for entity data and tax information for MZX so that she could "create a profile" for the entity, entitling her message "Stateline Invoices – Info Needed." Kauffman later responded – directly from the email address billing@colossusx.com – providing the requested MZX entity information.

56. By January 2026, construction was well underway at the Mississippi sites and Darana had already invoiced CTC many times for labor and materials charges in Mississippi. Kauffman's direction to invoice MZX – reflecting CTC's decision to pay for work through its agent MZX – had no effect on the nature of that work or the contractual arrangement that governed it. Just as they had for months before this change, the parties continued to hold weekly payment reconciliation meetings, at which the same group of representatives of CTC and MZX met to discuss outstanding payment issues with the same group of representatives of Darana. Both before and after the instruction to direct payment to MZX, the parties understood that the MSA's payment terms would govern Darana's Mississippi work. Darana purported to (but did not in fact) comply with those terms.

57. Darana's overbilling likewise remained unchanged. References to CTC therefore include CTC and its wholly owned subsidiary, MZX, as Darana routinely overcharged CTC both directly and by overcharging its agent MZX on purchase orders.

58. Darana has admitted that it billed MZX under the MSA and that MZX's payments were on CTC's behalf. On August 3, 2026, Darana sued CTC and MZX in Shelby County Chancery Court for failure to pay invoices under the MSA. Darana's complaint acknowledged that Darana entered into the MSA "with CTC to construct data centers at multiple locations in Tennessee, including" the Colossus site at 3231 Paul R Lowry Road in Memphis, and the Macrohard site at 5420 Tulane Road in Memphis. Darana TN Compl. ¶ 7. The complaint alleged that "Darana provided labor, equipment, material and services in accordance with the MSA" at those sites. *Id.* ¶ 8. And Darana further alleged that "CTC and MZX have failed to pay or have refused to pay outstanding invoices in excess of $136,892,782.78 within 30 days receipt of the invoice." *Id.* ¶ 32. The complaint also asserts a violation of the Tennessee Prompt

Payment Act against "CTC and MZX," even though that Act applies only if the contractor has "a written contract with an owner for improvement of real property." Tenn. Code 66-34-201. CTC and MZX removed that lawsuit, which is now consolidated with this one.

59. Darana's lien notice likewise confirms that Darana's work for MZX was performed under the MSA. That document, reflecting a sworn statement by Darana employee Brandy Petrak, states that Darana provided services to improve property owned by MZX in Shelby County "in pursuance of a certain contract with CTC Property LLC and/or MZX Tech LLC." *See* Darana TN Compl., Ex. F.

60. **Rate for Darana's Services.** Amendment One also modified the MSA's original "Basic Information Sheet" by specifying rates Darana could charge for services it performed:

> 1. Project Colossus. For all electrical and mechanical Services performed by [Darana] for the Colossus Project, [CTC] will pay [Darana] at the rate of $245 per hour, unless a lower rate is set forth in a Purchase Order accepted by [Darana].
>
> 2. Project Tulane. Commencing on the Amendment 1 Effective Date, for all electrical and mechanical Services performed by [Darana] for the Tulane Project, [CTC] will pay [Darana] at the rate of $200 per hour, unless a lower rate is set forth in a Purchase Order accepted by [Darana].

Amendment One ¶¶ 2.1, 2.2.

61. Amendment One did not modify the MSA's cap on Darana's markups. It did not even reference, much less eliminate, Section 2.4 of the original MSA, which continued to bar Darana from imposing a markup that exceeded 10%. That provision was among the MSA "terms" that "remain[ed] unmodified and in full force and effect." Amendment One § 8.

62. **Equity Incentive and Exclusivity.** Amendment One also added an exclusivity provision to the MSA, in a new Section 2.8. That provision required Darana and all "its affiliates as applicable" to "exclusively work for [CTC] for performing Services related to Data Center

Infrastructure . . . Projects." Amendment One § 4 (adding Section 2.8 to the MSA). Darana and its affiliates thus agreed to work solely on CTC data centers during the "Exclusivity Period," which ran from April 12, 2025, through April 12, 2027.

63. Section 2.3 of Amendment One also created an "Equity Incentive" for Cuttell. That incentive entitled Cuttell to restricted stock options worth $28,500,000 if three separate milestones tied to GPU commissions were reached.

64. Cuttell's right to the Equity Incentive vested "if and only if" two conditions were met. *See* Amendment One, Ex. A ¶ 4. *First*, Darana had to remain "in strict compliance with the terms of the Agreement including, without limitation, **Section 2.8** (Exclusivity)." Thus, if Darana, Cuttell, or any of his affiliated businesses worked on anything besides CTC supercomputing facilities during the exclusivity period, Cuttell's incentive would not vest. *Second*, Darana had to "continue the provision of Services for [CTC] until the expiration of the Exclusivity Period." *Id.* So if Darana stopped performing services for CTC at any point before April 12, 2027 – because the MSA terminated or for any other reason – Cuttell would lose the incentive. Section 2.3 emphasized that, "[i]f such vesting conditions shall not be met . . . [,] the [equity incentive awards] will be automatically forfeited without any further action." *Id.*

### C. Second Amendment to the MSA

65. The parties amended the MSA again on February 19, 2026, which they memorialized in MSA Amendment Number Two ("Amendment Two"). Amendment Two is attached as Exhibit 3. Like Amendment One, Amendment Two left all MSA terms in place unless expressly modified. *See* Amendment Two ¶ 2 ("Except as amended hereunder, all terms of the Agreement remain unmodified and in full force and effect and nothing in the Agreement is modified by this Amendment by implication or otherwise.").

66. Under Amendment Two, one third of Cuttell's equity incentive shifted to Darana's "Key Employee." Cuttell retained rights to the remaining two-thirds. Cuttell became a "Recipient" under the MSA, with rights and obligations under the agreement, as amended. Amendment Two, Ex. A ¶ 3.

67. Cuttell's equity incentives remained subject to the two vesting conditions outlined above. For both individuals, the incentive vested "if and only if" (i) "Recipient is in strict compliance with the terms of the Agreement including, without limitation, Section 2.8 (Exclusivity), and (ii) Recipient continued the provision of Services for [CTC]" until April 12, 2027. Amendment Two, Ex. A ¶ 4.

**D. Third Amendment to the MSA**

68. Shortly after the MSA's Second Amendment, the parties began negotiating a Third Amendment. As with prior amendments to the MSA, the Third Amendment was negotiated by members of xAI's Procurement and Engineering teams, including Tiffany Wilson-Vargas, with Darana representatives.

69. As had happened several times before during work under the MSA on supercomputing facilities in the greater Memphis area, in February of 2026, the parties discussed adjustments to Darana's labor rate and equity incentives for Cuttell.

70. On February 25, 2026, Wilson-Vargas emailed Cuttell to "confirm[ ] the agreement we finalized earlier" to modify Darana's labor rate for ongoing work under the MSA. Wilson-Vargas enumerated the agreed terms: (i) "Stateline Phase 4 and 5 will remain T&M"; (ii) "No additional equity options or grants"; and (iii) "All sites will now have the following hourly rates, retroactively back to January 1st, 2026": a $125/hour rate for non-skilled labor and

a $190/hour rate for skilled labor. These rates were lower than the $245/hour and $200/hour rates that previously applied at the Colossus and Tulane sites, respectively.

71. Wilson-Vargas's recitation of the parties' agreement in principle confirmed the parties' understanding that the MSA would continue to govern Darana's work in Mississippi. "Stateline" referred to the principal Macroharder construction site, located at 2400 Stateline Road, in Southaven, Mississippi. And her reference to "Stateline Phase 4 and 5" situated Darana's Mississippi work within the broader project that traversed the Mississippi-Tennessee border. Phases 1 through 3 meant the work performed at the Colossus and Macrohard construction sites, just across the border in Tennessee, where Darana's work had long been governed by the MSA and billed to CTC under the MSA's terms. Phases 4 and 5, in turn, meant the Macroharder and Duke construction sites in Mississippi. Wilson-Vargas indicated that Darana would continue to be compensated on a time-and-materials (or "T&M") basis, as it had been during previous stages of the project, only at reduced hourly rates.

72. The parties never formally executed Amendment Three. But in the months following Wilson-Vargas's February 25 email, the parties repeatedly exchanged correspondence treating Amendment Three as agreed. For instance, on April 22, 2026, Wilson-Vargas emailed Cuttell with the subject line, "Darana Amendment 3 re Rate Reduction," a clear reference to the lower rates for skilled and non-skilled labor set forth in her February 25 email. Wilson-Vargas wrote to Cuttell: "See attached amendment memorializing the rate adjustment agreed to."

73. Weeks later, on May 5, 2026, Darana likewise sent Amendment Three to xAI for purposes of implementing the Amendment's terms. Specifically, Darana employee Brandy Petrak sent Wilson-Vargas's Amendment Three back to xAI employee Jake Palmer, replying to

the same "Darana Amendment 3" email chain. Petrak explained to Palmer that "the attached Amendment 3 has the predetermined, billable labor rates listed."

74. Petrak's email attached a two-page document labelled "AMENDMENT NUMBER THREE TO MASTER SERVICES AGREEMENT," which is attached as Exhibit 4. That document explicitly "modifie[d] the Master Services Agreement effective April 15, 2024, as amended by Amendment 1 on April 12, 2025, and Amendment 2 on February 19, 2026." Amendment Three listed four work sites as the "Project where Services will be performed": (1) Project Colossus, at 3231 Paul R. Lowry Road in Memphis, Tennessee; (2) Project Tulane, a.k.a. "Macrohard," at 5420, 5414 & 5408 Tulane Road in Memphis, Tennessee; (3) Project Stateline, a.k.a. "Macrohardrr," at 2400 Stateline Road West in Southaven, Mississippi; and (4) Project Duke Power Plant, a.k.a. "Duke," at 2875 Stanton Road South in Southaven, Mississippi. It reiterated the provision from Amendment One that "[a]dditions and deletions to the Projects and Services may be accomplished by Statements of Work and/or Purchase Orders." Finally, it also reiterated the language from the prior Amendments that "[e]xcept as amended hereunder, all terms of the Agreement remain unmodified and in full force and effect and nothing in the Agreement is modified by this Amendment by implication or otherwise."

75. Consistent with their mutual assertions that Amendment Three was agreed and controlling, in the ensuing months, the parties treated Amendment Number Three as binding. Among other things, Darana purported to bill in accordance with the rates set forth in that Amendment, and CTC and MZX paid its charges at those rates until the present dispute arose. While the parties did not formally execute Amendment Three, the parties' correspondence and the text of the draft Amendment Three leave no doubt that the parties understood Darana's work in Mississippi for MZX was subject to the MSA, as modified in Amendment Three to adjust the

payment terms that the parties had "predetermined" and set forth therein. Amendment Three also memorialized that the scope of Darana's work under the MSA – which had already been expanded by purchase orders – would continue to include Darana's ongoing work in Mississippi. Accordingly, the MSA's terms, including the cap on markups for subcontracted labor, remained in force and effect for Darana's services in Mississippi.

## III. DARANA SYSTEMATICALLY BREACHED THE MSA AND TOOK STEPS TO CONCEAL THOSE BREACHES FROM CTC

76. From April 2024 through July 2026, CTC paid Darana roughly $1.4 billion for work on CTC's supercomputing facilities. CTC trusted and relied on Darana as a vital partner in completing the project. But Darana abused that trust. It serially breached the MSA, misrepresented its work, engaged in a concerted scheme to inflate its invoices to CTC (both directly and through CTC's wholly owned subsidiary MZX) and withheld required data. That misconduct led CTC to terminate the MSA for cause.

### A. Darana Secretly Marked Up Subcontracted Labor 800% Or More, Leading It To Overbill CTC For Labor By $500-$800 Million

77. The MSA allowed Darana to use labor subcontractors only with CTC's prior written approval. Once approval was given, the MSA capped Darana's markup on such subcontracted labor. To implement the cap, the MSA imposed two restrictions, requiring Darana to (a) clearly state its markup in a SOW, and (b) limit its markup to 10% over the rates Darana itself paid the subcontractors. For example, if Darana hired a subcontractor that charged it $30 per hour, Darana could mark up that labor by at most 10%, invoicing CTC no more than $33 per hour. The MSA required transparency throughout the process. Darana was required to disclose its markup so that CTC could ensure compliance with the 10% cap.

78. Darana breached those requirements. Throughout the project, it relied heavily on subcontractors without seeking CTC's prior approval and without disclosing its markup in any

SOW or purchase order. On information and belief, Darana employed only between 50 and 70 employees itself. Darana used subcontractors for the vast majority of the labor on the projects.

79. Darana compounded that breach by then imposing excessive markups on the labor it sourced from those unapproved subcontractors. Those undisclosed markups exceeded the contract's 10% cap many times over. Indeed, Darana charged CTC a uniform rate for all labor, whether performed by Darana or its subcontractors. That rate was orders of magnitude higher – typically 200% to 300% and, at times, upwards of 800% higher – than the rate that Darana paid the subcontractors who performed the work.

80. Darana concealed this practice from CTC by submitting invoices that failed to disclose that subcontracted labor was used, the rates subcontractors were charging Darana, the hours worked by subcontractors, or the markup Darana had applied. By submitting invoices with all services billed at the rate for labor Darana itself performed, Darana was representing that it, and not subcontractors, had performed the work. That was false. CTC paid those deceptive and misleading invoices until May 2026. From June 2024 through May 2026, CTC paid Darana more than $900 million for labor alone, much of which was inflated by the excessive, undisclosed markups that Darana was extracting.

81. Darana used misleading, inconsistent billing practices to conceal its subcontractor mark-ups. For instance, Darana <u>did</u> disclose that the labor billed on certain invoices was performed by subcontractors such as Roessner Fabrication ("Roessner"). Darana's charges for the labor performed by these subcontractors <u>complied</u> with the MSA's 10% cap on markups. The following are three examples:

- On April 14, 2026, Darana invoiced for labor performed by Roessner from April 6 through April 11 (Invoice #25-61414 (7385)). Darana disclosed that Roessner performed 437 hours of work at an $80/hour rate, for a total cost of $34,960, and Darana invoiced for $38,456 (the cost of Roessner's labor plus a 10% markup).

- On April 27, 2026, Darana invoiced for labor performed by Roessner from April 20 through April 25 (Invoice #25-61416 (7445)). Darana disclosed that Roessner performed 597 hours of work at its $80/hour rate, for a total cost of $47,760, and Darana invoiced for $52,536 (the cost of Roessner's labor plus a 10% markup).

- On May 5, 2026, Darana invoiced for labor performed by Roessner from April 27 through May 2 (Invoice #25-61417 (7448)). Darana disclosed that Roessner performed 535 hours of work at its $80/hour rate, for a total cost of $42,800, and Darana invoiced for $47,080 (the cost of Roessner's labor plus a 10% markup).

82. Darana's compliance with the 10% markup cap when disclosing subcontractor work reflected Darana's knowledge and understanding of that requirement. Those charges led CTC and MZX to believe that Darana was disclosing when it marked up subcontracted labor. Yet in many more instances—particularly as the projects wore on, the invoices grew larger, and Darana grew emboldened—Darana submitted "direct billing" invoices with no disclosures that subcontractors had performed the labor. In light of past practice and the MSA's explicit terms, these invoices duped CTC and MZX into believing that Darana personnel had performed the labor themselves. In reality, Darana had delegated the work to cheaper laborers and marked up the bills by large margins. Darana's non-disclosure of that subcontractor labor, when juxtaposed against the more limited subcontractor labor that it had previously divulged, allowed it to evade the 10% markup cap without detection.

83. Darana's timesheets for labor shed light on its scheme. For instance, a representative timesheet for the week ending April 20, 2024 separated out a list of 13 of Darana's own employees under a green heading "Darana," distinguishing them from a list of 12 subcontracted workers under a red heading "Road Dog," Darana's largest subcontractor. That separation reflected the MSA's disclosure requirements and allowed CTC to determine which workers Darana was employing directly and which ones it had subcontracted. But those disclosures soon vanished from Darana's future invoices. Two months later, Darana's timesheet for the week ending in June 29, 2024 simply grouped all 100+ on-site workers under the green

heading "Darana." The names listed under "Darana" included many of the 12 workers previously identified as Road Dog personnel. The implication was that Darana had hired those workers directly. That was false, but it allowed Darana to invoice CTC and MZX at the full rate for labor while concealing that it was sourcing the labor at a fraction of Darana's own rates.

84. Darana's inclusion of Road Dog laborers on its timesheets as "Darana" personnel enabled its fraudulent billing. Darana's labor charges to CTC for the week ending in June 29, 2024 are illustrative. This table shows the total labor hours billed to Project 24-235 for the week, juxtaposed with the labor charges billed by Darana to CTC on the applicable invoice.

| **Date** | **Hours Labor (per 6/29/24 timesheet)** | **Amount Charged (per Invoice 24-23543)** |
|---|---|---|
| Sunday 6/23 | 611 | $ 149,695.00 |
| Monday 6/24 | 1561.5 | $ 382,567.50 |
| Tuesday 6/25 | 1603 | $ 392,735.00 |
| Wednesday 6/26 | 1707 | $ 418,215.00 |
| Thursday 6/27 | 1630 | $ 399,350.00 |
| Friday 6/28 | 1829.5 | $ 448,227.50 |
| Saturday 6/29 | 1513 | $ 370,685.00 |

85. The comparison reflects that Darana's charges to CTC for the week ending June 29, 2024 simply applied a $245/hour rate – the applicable MSA rate for Darana employee labor at Project Colossus – to all hours on the timesheet, including those of Road Dog subcontractors.

86. Even when earlier timesheets broke out Road Dog subcontractors separately, Darana found other ways to manipulate the timesheets and inflate CTC's bills. For instance, Darana's timesheet for the week ending June 15, 2024 included an individual named Amber Webster as both a Darana employee and a Road Dog subcontractor. Darana billed CTC for 91 hours of Amber Webster's labor as a Darana employee (itself a massive number), and 84 hours

of Amber Webster's labor as a Road Dog subcontractor. In total, Darana charged CTC for a total of 175 hours of labor by Amber Webster for that one week.

87. In May 2026, CTC invoked its audit rights under MSA Section 9.12, demanding that Darana provide all "books and records necessary to substantiate Contractor's charges and invoices for reimbursement." CTC further requested "all invoices for subcontractors and suppliers for both material and labor." Darana refused the request, claiming that "[Darana's] ability to disclose certain vendor pricing, subcontractor relationships, and related proprietary information remains limited due to the confidentiality obligations governing those relationships." Darana also refused to disclose which of the workers were subcontractors. It further refused to disclose the hourly rates that subcontractors charged to Darana. Without that information, CTC cannot calculate the exact amount of Darana's prohibited overcharge.

88. Although Darana has refused CTC's audit requests, CTC does have incomplete insight into the amount of Darana's overcharges. In data CTC requested to claim tax credits, Darana inadvertently disclosed the hourly rates that it paid to certain subcontractors, revealing that Darana was paying some subcontractors between $21.60 and $112.50 per hour. For that same labor, however, Darana charged CTC rates ranging from $125 to $245 per hour, reflecting a markup of as much as 880%.

89. That pattern appeared consistent across Darana's billings. Road Dog billed Darana on average approximately $61 per hour. Darana billed CTC for this subcontractor's labor – without disclosing that it was subcontracted labor or obtaining CTC's prior consent – at $125 to $245 per hour, representing an approximately 200% to 400% markup.

90. Based on the information CTC has obtained to date, it estimates that Darana used subcontractors for at least 75% of the services it invoiced to CTC. CTC further estimates that

Darana's breach of the subcontractor markup cap led to roughly $500 to $800 million in overcharges. CTC cannot provide a more precise estimate of damages without discovery, because Darana still refuses to provide the underlying data in violation of MSA Section 9.12.

91. Darana further breached MSA Sections 2 and 4 by invoicing CTC for labor that was never performed. For example, Darana charged for some workers who logged more than 24 hours in a day and more than 168 hours in a week. Examples include Darana employee Chris Rodriguez, for whom Darana billed 115 hours in one day (May 9, 2025) to project 24-235E; Darana employee Renzo Toro, for whom Darana billed 125 hours in one day (June 13, 2026) to project 25-201M; and Darana employee Dane Hunter, for whom Darana billed 97 hours in one week (commencing April 12, 2026) to both project 25-601M and 25-611M for a total of 194 charged hours for the week. Other invoices reflected double-billing for the same labor and workers billing excessive hours for travel from their home to the job site. Again, CTC does not know the full scope of such overbilling because Darana refuses to comply with its obligations to provide underlying labor data reasonably necessary to validate its invoices.

92. Before May 2026, CTC paid Darana's invoices without full knowledge of Darana's scheme to inflate labor markups or that Darana was billing for fake labor.

### B. Darana Invoiced CTC for Unauthorized Services Unrelated to Supercomputing Facility Projects, Including Services Provided to IHRA – Violating the MSA and Cuttell's Exclusivity Agreement

93. The Basic Information Sheets in the MSA and subsequent Amendments and Purchase Orders established the permissible scope of Darana's work. Darana breached those provisions too. In doing so, it billed CTC for charges that had nothing to do with the supercomputing facilities on which Darana was supposed to be working. Indeed, Darana and

Cuttell exploited their relationship with CTC to divert funds from in-scope work to one of Cuttell's personal interests: hot rod racing.

94. Cuttell is the owner of IHRA, an organization governing motorsport competitions. CTC, xAI, and their affiliates have no connection to IHRA of any kind.

95. In violation of the MSA, Darana billed CTC for work and materials relating to IHRA, including for the Memphis Raceway. For example, Darana procured $88,000 worth of equipment like vests and safety goggles from a supplier called White Cap. The shipment was sent to 8415 Firebird Drive in Hamilton, Ohio – the address for IHRA's corporate headquarters.[4] Darana then charged those supplies to CTC, even though they were not used for the supercomputing facility projects and delivered no benefit to CTC.

96. White Cap invoices billed to CTC included the following:

- Vests - $23,958.86
- Safety glasses, saw blades, gloves - $23,293.58
- Surveyor vests and saw - $16,669.29
- Saw blades - $6,719.09
- Polyester gloves - $6,620.04
- Polyester gloves, saw blades - $7,492.27
- Saw blades - $ 4,472.09
- Polyester gloves - $2,837.16
- Polyester gloves - $2,677.25
- Polyester gloves – $1,891.44
- Flags - $617.48

These goods were procured for IHRA's hot-rod racing activities and had nothing to do with the data-center projects for which Darana was allowed to bill.

[4] International Hot Rod Ass'n, *Contact IHRA*, https://ihra.com/contact (last visited Aug. 2, 2026).

97. To date, CTC has identified more than a dozen invoices that Darana improperly submitted for products and services associated with IHRA locations, including 5500 Victory Lane, 17047 Bee Line Highway, and 8415 Firebird Drive.

98. To conceal Darana's and Cuttell's diversion of CTC resources, Darana submitted these invoices under orders for the Duke, Macrohard, and Macroharder projects, making them appear as legitimate expenses. CTC was thus duped into paying the invoices, believing they were for in-scope projects rather than payments for Cuttell's and IHRA's benefit. By submitting these White Cap invoices as part of the data-center construction projects under the MSA, Defendants misrepresented the nature of these purchases and fraudulently induced Plaintiffs to fund Defendants' recreational activities.

99. Those unauthorized charges violated not only the MSA's prohibition on invoices for out-of-scope work, but also the amendments' exclusivity provisions. As detailed above, Section 4 of Amendment One created an "Exclusivity Period" during which Darana "and its affiliates" agreed to "work exclusively for [CTC] for performing Services related to Data Center Infrastructure Center Projects." By performing services unrelated to CTC's data center projects – for example, by performing services for IHRA – Darana and Cuttell violated that provision. The resulting breach forfeits Cuttell's equity incentive. *See* Amendment Two, Ex. A ¶ 4 (stating that the award vests "if and only if" "Recipient [i.e., Cuttell] is in strict compliance with the terms of the Agreement including, without limitation, Section 2.8 (Exclusivity)").

100. Darana further breached the MSA by using xAI trademarks in IHRA promotional materials. Under the MSA, Darana had "no right to use any trademark or trade name of [CTC] or any affiliate [e.g., xAI]" without "prior written approval." MSA § 8.2. xAI LLC is a CTC affiliate and owns several xAI and xAI-formative trademarks. Darana was IHRA's major

marketing partner and title sponsor. Despite the MSA's prohibition on unauthorized trademark use, as part of its marketing efforts for IHRA, Darana and Cuttell placed xAI trademarks on IHRA promotions and apparel.

101. IHRA personnel also publicly wore jackets bearing both IHRA and xAI trademarks during an industry event in December 2025 and at IHRA shows through at least March 2026. xAI LLC authorized none of this, in writing or otherwise.

102. Darana's and Cuttell's impermissible use of xAI trademarks in support of their side project with IHRA caused the harm that MSA Section 8.2 was designed to prevent. Defendants' misuse of xAI's trademarks confusingly and misleadingly implied xAI's support for, affiliation or association with, or connection to IHRA, while also generating harmful public speculation that xAI wanted to convert racetracks into data centers.[5] Such insinuations were false. There was and is no link between xAI and IHRA, but Darana's diversion of CTC resources to IHRA projects and misuse of xAI LLC's trademarked material for IHRA purposes created the false impression otherwise.

103. In addition to damaging xAI's reputation, this impermissible use of xAI's trademarks allowed Darana and IHRA to generate customer interest based on the misperception of xAI's sponsorship or support, interest that allowed Darana and IHRA to obtain profits they would not otherwise have obtained.

104. Cuttell is personally liable under the Lanham Act for IHRA's use of xAI trademarks to buttress its business and support its activities. He is the sole owner of IHRA and

[5] *See*, *e.g.*, Reddit, r/dragracing, *I Get Why People Are Skeptical of Darryl Cuttell's IHRA Ownership and Purchasing of Tracks* (May 28, 2026), https://redd.it/1tql3uq; *Racing for Land: Is IHRA's Expansion a Trojan Horse for Tech Data Centers?* (July 14, 2026), https://speedway actionimages.com/2026/07/14/racing-for-land-is-ihras-expansion-a-trojan-horse-for-tech-data-centers/.

exercises full control over its activities. On information and belief, he personally made the decision to place xAI's trademarks into IHRA branding. He is therefore directly and vicariously liable for IHRA's repeated infringements of xAI LLC's trademarks.

### C. Darana Breached MSA Section 9.12 by Refusing To Provide Records CTC Reasonably Requested To Validate Invoices

105. In May 2026, CTC's concerns about Darana's misconduct were mounting. CTC thus requested information to substantiate Darana's invoices, including all underlying invoices Darana received from the subcontractors and vendors supplying labor and materials to Colossus. CTC requested that information to verify what downstream parties had charged to Darana and thus evaluate the extent to which Darana had applied excessive markups. The requested information would also have allowed CTC to determine which personnel performing work on the project were Darana employees and which were subcontractors – a necessary step in validating Darana's invoices and calculating the size of the markup it had charged.

106. Section 9.12 of the MSA required Darana to provide that information. It provided that "[a]ll payments received pursuant to this Agreement, and Contractor's Services and workplace area and related offices shall be subject to audit and inspection by Company . . . . Contractor shall comply with all reasonable requests by Company to make available books and records necessary to substantiate Contractor's charges and invoices for reimbursement."

107. On May 11, 2026, Darana sent CTC a letter rejecting the audit request. Darana claimed that its ability "to disclose certain vendor pricing, subcontractor relationships, and related proprietary information remains limited due to the confidentiality obligations governing those relationships." Darana did not cite or acknowledge MSA Section 9.12 and offered no other explanation for its refusal to provide the information CTC requested.

108. In a June 25, 2026 letter, CTC explained that Darana's refusal to provide requested data violated Section 9.12 and that its claims concerning confidentiality could not justify that refusal. CTC then reiterated its request in a June 30, 2026 email.

109. As CTC explained to Darana, its asserted "confidentiality" obligations to third parties do not absolve Darana of its duty to provide the information the MSA requires. Under Section 5.1(vii), Darana warranted that its performance under the MSA, including under Section 9.12, "will not violate any other agreement" such as purported third-party confidentiality agreements. So if Darana truly agreed to third-party confidentiality obligations that foreclosed it from complying with Section 9.12, it breached its warranty and only added to its long list of contract violations. But Darana likely never entered such an agreement regardless. On information and belief, Darana's confidentiality obligations to third parties have exceptions for information that Darana is obligated to provide under the audit procedures the MSA imposes.

110. Darana's explanations for withholding data soon shifted. Once CTC explained why the "confidentiality" excuse was baseless, Darana offered a new one. According to its latest rationale, proffered in July 2026, Darana could not provide labor data because CTC was disputing the fees Darana had charged for labor. The premise was true enough: the parties are indeed engaged in such a dispute. But Darana's conclusion was backwards. The core purpose of the audit provision is to allow CTC to obtain information necessary to validate – and dispute if necessary – the labor charges Darana billed. By withholding the data to increase its leverage in a billing dispute with CTC, Darana turned the audit provision on its head.

111. As a direct result of Darana's bad-faith breach of the MSA's data-sharing provision, CTC has incurred significant legal and other expenses. What should have been a simple exercise – receiving the data from Darana – has turned into a complicated forensic

examination in which CTC's lawyers and consultants had to piece together information from other sources. That exercise confirmed that Darana has extracted large overcharges. But Darana's breach of its data-sharing obligations obstructed CTC from determining their full extent. Among other things, that impediment precluded the parties from having an informed discussion to resolve this dispute without litigation.

112. Apart from breaching the MSA and damaging CTC, Darana's response to CTC's records requests acknowledged once again that the MSA governs *all* work performed by Darana for CTC's supercomputing facilities, whether in Mississippi or in Tennessee. Its refusal letter stated, "As you are aware, Darana Hybrid, Inc. entered into the Master Services Agreement effective April 15, 2024, together with the subsequent Amendments thereto, with the understanding that the Services being performed involve highly specialized Data Center Infrastructure Projects . . . ." Darana then continued: "*In connection therewith*, Darana Hybrid, Inc. has continuously performed in good faith and maintained uninterrupted 24/7 operational support for the Memphis projects, including Project Colossus, Project Tulane (Macrohard), *Project Stateline (Macrohardrr), Duke, and related operational sites*." (Emphasis added).

113. As set forth above, both "Project Stateline (Macrohardrr)" and "Duke" refer to Mississippi construction sites (albeit within close proximity of Memphis) where Darana billed the majority of its work to MZX. The "Macrohardrr" site was located at 2400 Stateline Road West, and the "Duke" site was located at 2875 Stanton Road South—both in Southaven, Mississippi. Darana's audit rights refusal letter thus acknowledged that it billed the Mississippi work to MZX under the MSA and subject to its terms.

### D. Darana Violated Its Obligations To Conduct an Orderly Transition Following Termination

114. As a result of Darana's serial breaches and misconduct, CTC terminated Darana for cause on June 23, 2026. CTC's notice of termination cited Darana's material breaches and defaults, including its violation of MSA Sections 2.1, 2.4, 4.1, 5.1, and 9.12.

115. After CTC terminated Darana for cause, it was entitled to "withhold and offset any amount otherwise owed to Contractor to the extent reasonably necessary to compensate Company for such damages." MSA § 7.2. CTC estimates that Darana overcharged it by at least $500 to $800 million. Under Section 7.2, CTC is thus entitled to withhold between $500 to $800 million that would otherwise be owed to Darana. In a July 28, 2026 letter, Darana claimed that CTC owes $136,892,782.78 for work in Tennessee, as well as undisclosed amounts for work in Mississippi. Because Darana has refused to provide the information CTC has requested, CTC cannot validate how much of this claimed amount might otherwise be owed. But even if the amount were undisputed, CTC is entitled to withhold the entire amount (and more) because Darana's overcharges far exceed outstanding amounts that Darana claims it is owed.

116. Darana has since retaliated against CTC for withholding disputed amounts pursuant to Section 4.2 by filing liens against Plaintiffs in Mississippi and Tennessee. Darana has filed the following liens against Plaintiffs in Tennessee, totaling $136,892,782.78:

| Site | Document | Amount | Date | Record Reference |
|---|---|---|---|---|
| Lowry & Tulane | Prompt Pay Demand | $136,892,782.78 | 2026 07 28 | N/A |
| Lowry | Notice of Mechanic's and Materialmen's Lien | $18,646,622.43 | 2026 07 30 | 26064556 |
| Tulane | Notice of Nonpayment | $118,246,160.35 | 2026 07 29 | N/A |

| Site | Document | Amount | Date | Record Reference |
|---|---|---|---|---|
| Tulane | Notice of Mechanic's and Materialmen's Lien | $118,246,160.35 | 2026 07 31 | 26064953 |

117. Darana has also filed the following liens against Plaintiffs in Mississippi, totaling $432,455,431.16:

| Site | Type / Document | Amount | Date | Record Reference |
|---|---|---|---|---|
| All Four MS Sites | Final Payment Demand | $432,455,431.16 | 2026 07 29 | N/A |
| Area 51 | Notice of Lien Claim | $2,407,548.18 | 2026 08 05 | C26/368-373 |
| Duke | Notice of Lien Claim | $50,016,402.30 | 2026 08 05 | C26/374-381 |
| Nail Road | Notice of Lien Claim | $439,794.10 | 2026 08 05 | C26/382-387 |
| Stateline | Notice of Lien Claim | $379,591,686.58 | 2026 08 05 | C26/388-393 |

118. Darana's liens against Plaintiffs are invalid and without basis. CTC has appropriately withheld disputed amounts from Darana pursuant to its rights under Section 7.2 of the MSA. Darana has no entitlement to those amounts, which reflect a setoff for some portion of the damages caused by Darana's numerous breaches of contract and other misconduct.

119. Following termination, Darana was obligated to "cooperate in the orderly wind-down of the parties' performance of this Agreement." MSA § 7.4. It has done the opposite. Instead of cooperating, it has committed further breaches and engaged in outright fraud.

120. *First*, CTC's work on the project continues, requiring a steady flow of supplies and materials from vendors. Darana's intentional post-termination conduct has jeopardized the delivery of those supplies and materials. Darana admitted that it has not paid many of the suppliers and vendors that have provided materials to Darana for use on the project. Darana's breach of its obligations to these vendors threatens to disrupt CTC's ongoing work.

121. Following termination, Darana fraudulently induced CTC to make a $44.39 million payment to pay specific suppliers that were critical to the project. Darana told CTC, and CTC agreed, that these suppliers needed payment because they were continuing to deliver materials for ongoing work at the supercomputing facilities. For that reason, the parties agreed that CTC would make a payment to Darana that it would forward to the appropriate suppliers. Rather than follow through, Darana siphoned those funds for its own purposes.

122. Specifically, after termination, Darana threatened CTC on June 26 and June 29 that, unless the downstream suppliers and vendors were paid, those suppliers and vendors would record mechanics' liens and file lawsuits, grinding ongoing work on the supercomputing facilities to a halt. Darana was represented in these discussions by its outside counsel: Marc Sanchez from the law firm Frantz Ward, and Ross Bextermueller from the law firm Keating Muething & Klekamp. Through counsel, Darana indicated that it would not itself pay any such suppliers or vendors unless CTC made additional payments. These threats implied that Darana would not fulfill its duty to discharge any such subcontractor liens itself. *See* MSA § 4.2.1.

123. During the week of July 2, 2026, CTC painstakingly validated a set of invoices for materials that had been delivered to project sites. These materials were procured by DESCO – a Darana affiliate also owned by Cuttell – from critical suppliers and vendors that were continuing to deliver materials to CTC project sites. CTC was able to validate a subset of charges for legitimate supplies, which it wanted to pay promptly. CTC informed Darana that it was "prepared to pay $45M tomorrow (Thursday [July 2, 2026]) ***for specific materials*** the company was able to verify are legitimate," adding that "[t]hese are Desco materials." CTC also advised that the $45 million payment was "the complete out-of-pocket cost for the materials and excludes the invoice markup."

124. On July 2, 2026, Darana's counsel Marc Sanchez responded on Darana's behalf: "This is agreeable." Darana, through Sanchez, made this response with the fraudulent intent to induce payment from CTC. Darana had no contemporaneous intent to comply with CTC's stated conditions for that payment and instead intended to put the money to its own purposes.

125. On July 2, 2026, CTC made a payment of $44,394,472.54 to Darana. CTC followed up with specific remittance information identifying particular invoices tied to particular materials, to which the parties agreed to route the payment. Below is a list of the invoices provided to Darana.

| Invoice No. | Invoice Description |
|---|---|
| 25-61046R | Wire (500-4/C) WE 05.09.26 |
| 25-61047 | Wire (500-4/C) WE 05.09.26 |
| 25-61048 | Wire (500-4/C) WE 05.09.26 |
| 25-61049 | Wire (500-4/C) WE 05.09.26 |
| 25-61050 | Wire (500-4/C) WE 05.09.26 |
| 25-61053 | Wire (500-4/C) WE 05.16.26 |
| 25-61054 | Wire (500-4/C) WE 05.16.26 |
| 25-61055 | Wire (500-4/C) WE 05.16.26 |
| 25-61056 | Wire (500-4/C) WE 05.16.26 |
| 25-61060 | Wire (500-4/C) WE 05.23.26 |
| 25-60018 | Duke Turbines Wire (350-3/C) WE 04.18.26 |
| 25-60019 | Duke Turbines Wire (500-3/C) WE 04.18.26 |
| 25-40069 | Wire (750-1/C) - Duke Site WE 04.25.26 |
| 25-60022 | Duke Turbines Wire (500-3/C) WE 04.25.26 |
| 25-60026 | Duke Turbines Wire (500-3/C) WE 05.02.26 |
| 25-60027 | Duke Turbines Wire (350-3/C) WE 05.02.26 |

| Invoice No. | Invoice Description |
|---|---|
| 25-40072 | Wire (750-1/C) - Duke Site WE 05.09.26 |
| 25-40073 | Wire (1000-1/C) - Duke Site WE 05.09.26 |
| 25-60030 | Duke Turbines Wire (500-4/C) WE 05.09.26 |
| 25-60035 | Duke Turbines Wire (500-3/C) WE 05.23.26 |
| 25-200294 | Wire (750-1/C) WE 06.13.26 |
| 25-200295 | Wire (1000-1/C) WE 06.13.26 |
| 25-200296 | Wire (500-4/C) WE 06.13.26 |
| 25-200297 | Wire (750-3/C) WE 06.13.26 |

These invoices totaled $44,394,472.54, after backing out Darana's 13.13% markup.

126. In follow-up calls on July 14 and July 15, 2026, CTC asked for confirmation that the funds had been or would be delivered according to these remittance instructions. Darana's counsel confirmed that Darana had already directed a portion of the payment to DESCO for payment downstream and that Darana's accounting team would direct the payment according to CTC's remittance instruction. Darana's counsel agreed to provide confirmation once the payments were issued.

127. Although Darana had promised that CTC's roughly $45 million payment would be used to pay for specific materials procured by DESCO from critical suppliers, Darana revealed on July 17, 2026 that it actually diverted the money for other purposes. When pressed, Darana admitted it had not followed CTC's remittance instructions. It further claimed that it would be impossible to trace where the money actually went. From what little information Darana did provide, it appears to have directed substantial portions of the money to 40 different hotels, both in and around Memphis and outside of Tennessee, as well as to equipment rentals and staffing agencies. Darana then requested that CTC make *additional* payments to DESCO

and the critical materials suppliers that Darana had failed to pay with money CTC had paid for precisely this purpose. In a July 21, 2026 email, Darana threatened that "[m]aterials are going to stop flowing to the project sites if this is not resolved." When CTC asked Darana to apply the payment CTC made on July 2 to the specified suppliers – as previously agreed – Darana refused.

128. Darana was required to "cooperate in [an] orderly wind-down" but instead fraudulently induced CTC to make a $45 million payment that Darana misdirected to its own benefit. It then attempted to extract further payments from CTC to resolve a crisis – lack of funds flowing to critical suppliers – that Darana's own diversion of funds had caused. Thus, Darana breached MSA Section 7.4, committed fraud, breached a binding agreement about how to direct the funds, and illegally converted the funds CTC paid, while also violating the implied covenant of good faith and fair dealing.

129. CTC is concerned that subcontractors and suppliers have not been paid. Darana is responsible for paying these entities, and its failure to do so is inexcusable. For years, CTC paid Darana's invoices that marked up material and labor costs hundreds of millions of dollars above Darana's own cost, so Darana has received more than enough to pay its vendors. After raking in CTC's money, Darana schemed to induce CTC into making an additional $45 million payment on false pretenses that the money would be used to pay those vendors. Darana's decision to divert this payment to its own purposes is causing needless disruptions to the project.

130. CTC is attempting to mitigate this harm by working directly with vendors, but Darana is frustrating these efforts by organizing vendors to coordinate action against CTC for money *Darana* owes. This is the opposite of cooperating with CTC in an orderly wind-down.

131. Since CTC filed this complaint, Darana's misconduct has only escalated. Over the past few months, Darana's misconduct has spurred multiple subcontractors and suppliers to

file liens and other notices of dispute, based on Darana's refusal to pay them. Darana's subcontractors and suppliers have filed the following liens and notices in Tennessee, totaling $7,354,739.85:

| Claimant / Site | Type / Document | Amount | Date | Record Reference |
|---|---|---|---|---|
| USW-Menard / Lowry | Notice of Lien | $2,265,154.46 | 2026 07 02 | 26055070 |
| ISCO / Lowry | Notice of Lien | $224,126.50 | 2026 08 20 | 26072057 |
| Omni Cable, LLC / Lowry | Notice of Lien Claim | $6,700.00 | 2026 09 10 | 26079036 |
| TorcSill / Tulane | Claim of Lien and Sworn Statement of Amount Due | $64,930.73 | 2026 07 16 | 26059872 |
| Omni Cable, LLC / Tulane | Notice of Lien Claim | $596,986.73 | 2026 09 10 | 26079035 |
| Charles N. White Constr. Company (White Constr.) / Tulane | Notice of Lien and Sworn Statement | $201,241.47 | 2026 09 11 | 26079459 |
| Insulation & Refractories / Lowry | Notice of Nonpayment / demand | $504,756.25 | 2026 07 09 | N/A |
| Hart Fueling LLC, fka Hart Fueling Servs. LLC / Lowry | Notice of Lien | $65,037.51 | 2026 09 15 | 26080445 |
| Wells Plumbing & Heating Supplies, Inc. dba Supply Line / Lowry | Notice of Mechanic's and Materialmen's Lien | $263,784.53 | 2026 09 15 | 26080590 |
| Vol Power Sales, Inc. / Lowry | Notice of Non-Payment / Prompt Pay Act Notice | $931,366.40 | 2026 08 31 | N/A |
| Double S / Tulane | Notice of Non-Payment / Prompt Pay Act notice | $1,683,045.00 | 2026 07 30 | N/A |

| Claimant / Site | Type / Document | Amount | Date | Record Reference |
|---|---|---|---|---|
| Vulcan Mats. Co. / Vulcan Constr. Mats., LLC / Tulane | Notice of Lien | $170,922.57 | 2026 09 16 | 26080762 |
| Hart Fueling LLC, f/k/a Hart Fueling Services LLC / Tulane | Notice of Lien | $376,687.70 | 2026 09 15 | 26080444 |

132. Darana's subcontractors and suppliers also filed the following liens and notices in Mississippi, totaling $46,790,093.74:

| Claimant / Site | Type / Document | Amount | Date | Record Reference |
|---|---|---|---|---|
| Mechanical Systems / Nail Road | Notice of Lien | $4,598.50 | 2026 03 10 | C26/84-89 |
| Mechanical Systems / Nail Road | Notice of Lien | $2,878.00 | 2026 03 10 | C26/90-95 |
| BrandSafway Solutions LLC / Stateline | Construction Lien / Claim of Lien | $1,644,406.29 | 2026 09 02 | C26/426-430 |
| Omni Cable, LLC / Stateline | Notice of Lien Claim | $42,039,644.74 | 2026 09 03 | C26/431-435 |
| Vol Power Sales, Inc. / Stateline | Demand for Payment / Notice of Nonpayment under MS Prompt Pay Act | $3,098,566.21 | 2026 08 31 | N/A |

133. Darana's failure to resolve these liens constitutes another breach of contract. Under Section 4.2.1 of the MSA, Darana agreed that "[i]f any claim or lien is filed by one of Contractor's subcontractors or suppliers, Contractor shall cause such lien to be discharged within three (3) days after filing, at Contractor's expense, by: (a) filing the bond required by law; or (b) providing Company with a court order discharging the lien; or (c) providing Company with another form of protection against such lien which is acceptable to Company, in its sole discretion." Darana has done none of those things. Rather than resolve the liens by posting an

adequate bond or negotiating a resolution with the subcontractors, Darana has pointed the finger at CTC and frustrated CTC's efforts to resolve the subcontractors' concerns directly.

134. Section 4.2.1 of the MSA further provides that Darana "shall indemnify and hold harmless Company for all costs, including but not limited to attorneys' fees, regarding any such liens. Contractor's obligation to bond off all liens of its subcontractors and suppliers is absolute and unconditional, and Contractor's failure to bond off any lien shall be deemed a material breach and default of this Agreement." Darana has not complied with this provision either.

135. Darana's failure to bond off these liens or otherwise cause them to be discharged has caused harm to CTC and MZX, including by causing Plaintiffs to incur substantial attorney's fees, reputational and credit-related harms, and other business costs associated with addressing these liens and dispute notices.

136. *Second*, the day after CTC terminated Darana, and without notice to CTC, Darana sent a letter to the Shelby County, Tennessee Construction Code Enforcement Action Office to request the "immediate voidance of all permits issued to Darana" at the Project Colossus and Project Tulane sites. Cuttell also "expressly direct[ed]" Ms. Anderson and her office to not "reassign[ ], transfer[ ], reinstate[ ], or reissue[ ]" the permits to "any contractor, subcontractor, property owner, or other entity." An "orderly wind-down" required the efficient transfer of necessary permits, but Darana actively worked to impede such a transfer.

137. CTC subsequently applied for expedited permits to ensure that the project would not be disrupted. CTC has spent more than $8 million on these permits. These significant costs would have been avoided if Darana had cooperated with CTC to transfer – rather than immediately void – permits for an ongoing construction site.

138. *Third*, CTC received press inquiries on July 31, 2026 stating that Darana had recorded liens on CTC's properties in Memphis. Recording liens is a direct attempt to hinder the project, which is the opposite of an orderly wind-down of operations. It has further threatened that subcontractors will record liens, which Darana has the obligation to discharge under Sections 4.2 and 4.2.1 of the MSA. Indeed, Darana was required to "provide unconditional lien releases and claim waivers" with "each invoice" it submitted. MSA § 4.2. And if any subcontractor or supplier recorded "any claim or lien," Darana was obligated to "cause such lien to be discharged within three (3) days after filing." *Id.* § 4.2.1. Darana appears intent on flouting those commitments by repeatedly threatening liens that it will not discharge.

139. Moreover, Darana has brought its dispute with CTC to the media, in breach of the MSA's confidentiality provisions. In a July 31, 2026 interview with the Daily Memphian, Cuttell revealed confidential details concerning Darana's work with CTC, including the total Darana billed, the amount CTC allegedly still owes, the amount Darana owes its vendors, the timeline for completing one of the supercomputing facilities, and Darana's payment structure.[6] The MSA defines Confidential Information to include "all information . . . which is disclosed to or learned by [Darana] in the performance of this Agreement . . . and which relates to," among other things, "internal business information of [CTC] . . . including . . . information relating to . . . cost, rate and pricing structures, accountings, [and] financial information." MSA § 10 (Definitions). And the MSA prohibits Darana from "disclos[ing] . . . any Confidential Information." By disclosing financial information such as general contractor costs and payments and pricing structures, Darana violated the MSA's prohibition on revealing Confidential

[6] *SpaceXAI Contractor said Company Owes It $570M*, Daily Memphian (July 31, 2026), https://dailymemphian.com/section/business/article/65243/spacexai-contractor-memphis-data-center-owes-money-elon-musk

Information. Moreover, building a media campaign against CTC and denigrating CTC affiliates is inconsistent with Darana's separate contractual obligation to cooperate in an orderly wind-down of its work on CTC's projects.

### E. Darana Brought Litigation in Mississippi in Violation of the MSA's Forum Selection Clause

140. Darana's defiance of its contractual obligations did not end with Plaintiffs' filing of this lawsuit. On August 6, 2026, two days after Plaintiffs filed their initial complaint, Darana filed suit against MZX in Mississippi state court, in the Circuit Court for DeSoto County.

141. Darana's Mississippi complaint seeks payment for "labor, materials, equipment, and services" provided to MZX under the MSA at four sites specified in the complaint: (i) "Macroharder, 2400 Stateline Rd., Southaven, Mississippi"; (ii) "Macroharder, 2875 Stanton Rd., Southaven, Mississippi"; (iii) "Macroharder, 3883 US-51, Southaven, Mississippi"; (iv) "Macroharder, 7700 Nail Rd., Olive Branch, Mississippi." Darana MS Compl. ¶ 8. These four "Macroharder" sites sit adjacent to the Mississippi-Tennessee state line, within walking distance of the "Macrohard" supercomputing project just across the border in Tennessee. As alleged above, the parties repeatedly manifested their understanding that the MSA governed the Mississippi work just like it governed the work across the border in Tennessee.

142. Yet Darana's Mississippi complaint makes no mention of the MSA. Instead, it alleges that "Darana was providing these Construction Services per a verbal agreement between Darana and Christian Kauffman at X.AI," pursuant to which "Mr. Kauffman directed Darana to invoice MZX for Construction Services performed on all the Projects in DeSoto County, Mississippi." Darana MS Compl. ¶ 10. In fact, as alleged above, Kauffman's direction arose under the MSA, as he made clear at the time and as all parties understood and confirmed through

their course of performance. There was no separate verbal agreement or any understanding that Darana could perform work on the Macroharder sites outside the MSA's terms.

143. On the basis of that putative oral agreement, Darana alleges, it performed several hundred million dollars of work for MZX at the "Macroharder" sites, and has sustained "actual damages in excess of $432,455,431.16" as a result of MZX's non-payment. *Id.* ¶ 22.

144. Darana's Mississippi lawsuit seeks payment for work subject to the MSA without complying with the MSA's terms. Most plainly, Darana's lawsuit violates the MSA's forum-selection clause, which requires that Darana must litigate any claims with CTC or its agents (including MZX) in an "appropriate court of law located in Memphis, Tennessee." MSA § 9.17. Indeed, the forum selection clause does not even require the litigation to arise out of the MSA. Rather, it states the parties' agreement that if *any* litigation is necessary between them, the litigation will take place in Memphis. *Id.* ("The parties hereby agree that should litigation be necessary, the forum for said litigation shall be the appropriate court of law located in Memphis, Tennessee."). Darana has no justification for bringing its claims for work performed at the Macroharder sites in Mississippi, rather than Tennessee as the contract requires.

145. As a result of Darana's breach of the MSA's forum selection clause, CTC and MZX have incurred substantial costs of defending a Mississippi state-court lawsuit that should have been brought in Tennessee. Had Darana complied with the forum selection clause, it would have filed those claims in Tennessee, in a proceeding that likely would have been consolidated with this one, generating substantial efficiencies and cost savings for CTC and MZX.

## IV. DARRYL CUTTELL IS RESPONSIBLE FOR THE MISCONDUCT OF DARANA AND IHRA

### A. Cuttell Controls Darana and IHRA and Is Liable for Their Misconduct

146. Cuttell controls Darana as its sole owner. Since 2015, Darana's corporate filings have listed Cuttell as the sole member of Darana's Board of Directors. Corporate filings have variously listed Cuttell as Darana's CEO, President, Director, Secretary, and Treasurer, and Cuttell signs the annual reports on behalf of the company. When Darana merged in 2011 with another Cuttell-owned company called Darana Electric (US), Inc., Cuttell signed the merger documents on behalf of both entities.

147. Cuttell also personally controls IHRA, an entity he uses to pursue his personal passion of hot-rod racing. Cuttell purchased the organization in December 2024 from its prior owner. Earlier that same month, IHRA announced that Darana had entered into a multi-year title sponsorship with the organization, which would allow the IHRA to "significantly increase purses in the IHRA Superseries, as well as the return to Nitro Jam and Pro-Am events."[7]

148. Darana and IHRA are just two nodes in an expansive network of over 60 entities affiliated with or owned by Cuttell. These entities – many of which contain "Cuttell" or "Darana" in the name – share common headquarters, employees, outside advisors, and business engagements (like the supercomputing facility projects for xAI at issue here). On information and belief, the nominal distinctions between these entities are largely superficial. Most if not all are subject to Cuttell's sole control.

149. Both Darana and IHRA are headquartered at the same address: 903 Belle Avenue, Hamilton, Ohio 45015. Twenty-four other Cuttell-affiliated entities are headquartered

[7] *New Sponsor Purchases IHRA*, Speed Sport (Dec. 20, 2024), https://speedsport.com/drag-racing/new-sponsor-purchases-ihra/.

at the same address. Corporate documents indicate that at least 18 of these entities were organized by Cuttell himself, or by another entity that was itself organized by Cuttell. For all the remaining entities headquartered at 903 Belle Avenue, corporate documents indicate that Cuttell is either the entity's sole member, CEO, President, or statutory agent. On information and belief, Cuttell owns and controls all 26 entities headquartered at 903 Belle Avenue.

150. One of the 26 Cuttell entities headquartered at 903 Belle Avenue is Cuttell Investments LLC ("Cuttell Investments"). Corporate documents list Darryl Cuttell as the president, CEO, member, and officer of Cuttell Investments. In 2024, a mortgage on the 903 Belle Avenue headquarters building was obtained by Cuttell Investments. Cuttell Investments is also listed on various financing documents alongside Darana and other Cuttell-affiliated entities.

151. The vast majority of other Cuttell-affiliated entities are likewise headquartered at a small handful of office addresses in the greater Cincinnati area, including 1 East 4th Street, Suite 1400, Cincinnati, Ohio 45202, and 345 High Street, Hamilton, Ohio, 45011.

152. Several of the Cuttell-owned entities headquartered at 903 Belle Avenue provided subcontracted services to Darana for the supercomputing construction projects governed by the MSA. These included, among others, DESCO LLC ("DESCO"), MECCA-GC LLC ("MECCA-GC"), and Thompson Metal Fabrication LLC (d/b/a TMF Metal Solutions) ("TMF"). Many of the other entities headquartered at 903 Belle Avenue are related to IHRA's racing operations, including, for instance, Atlanta Dragway Operations LLC, Larry Morgan Racing Engines LLC, Piedmont Dragway Investments LLC, and Rockingham Speedway Operations LLC.

153. Cuttell's use of superficially separate corporate entities has facilitated the contract violations and fraudulent overbilling described in this Amended Complaint. TMF is one example. Cuttell is TMF's registered agent and, on information and belief, controls it. In July

2026, Brown Strauss, Inc. filed a mechanic's lien against TMF, Darana, and Cuttell Investments, listing TMF as the "hiring party" and Darana and Cuttell Investments as the "Owner(s)." Other suppliers, such as Phoenix Metals Company, invoiced TMF and Darana jointly over the course of the supercomputing facility projects. Supplier invoices to TMF listed TMF's contact email as accounting@daranahybrid.com, and the job name as "Darana build out." Cuttell also personally communicated on behalf of TMF (as in an April 2026 email to Wilson-Vargas, forwarding a note from Tyler Moore at TMF), and xAI directed inquiries regarding TMF to him.

154. Over the course of the supercomputing projects, Darana issued work proposals to xAI that treated TMF as a subcontractor. For instance, an August 2024 email from Alex Roach at Darana / MECCA-GC to xAI employees Brent Mayo and Dan Rowland provided a breakdown for "mechanical prefab building" with line items from TMF, which Darana identified as a vendor for the project. Roach wrote to xAI that the prices from the vendors are "all-in and include our markup." But TMF regularly obtained and provided materials for the project with its own 10% markup (as in TMF invoices HN00016012, CH00008867, MN00023603 to Darana, and others), followed by a subsequent, additional 10% markup by Darana (as in Darana's Brown Strauss Steel invoices bearing the same numbers)—both of which entities are owned and controlled by Cuttell. This system allowed Cuttell to maximize his profits from the projects solely by virtue of funneling the work through multiple separate business entities.

155. Many Darana employees work simultaneously for multiple Cuttell entities. For instance, xAI employees who interfaced with Darana on the supercomputing facility projects frequently corresponded with Darana employee Alex Roach on important logistical issues related to the projects. Yet Roach corresponded with xAI employees such as Christian Kauffman from a MECCA-GC email address (a.roach@meccagc.com). Roach regularly communicated with xAI

on behalf of each of Darana, MECCA-GC, and TMF, responding to inquiries directed to each of those entities from xAI employees such as Tom Fowlkes.

156. The LinkedIn profiles of other Cuttell employees reflect the lack of formal separation between Cuttell-owned entities and contemporaneous employment by more than one entity. For instance, Ryan Miller's LinkedIn profile states that he has worked in finance operations at Darana since December 2024 and also as CFO of IHRA since April 2025. Peter Beaumont's LinkedIn profile states that he has served as "IHRA Director of Track Management and Operations" since July 2025, but describes his work in that role as "Report to Darana Hybrid on the progress of each IHRA acquired Track." Josh Burton's LinkedIn profile states that he has served as a project manager at "Darana Hybrid Inc. / IHRA" since August 2025.

157. Two employees issued xAI badges at the supercomputing facility worksites (David Evans and Maurice Allen) were identified as Darana employees. But both Evans and Allen have IHRA email addresses (david@ihra.com and mallen@ihra.com). Both of their LinkedIn profiles also indicate that they work at IHRA and contain no reference to Darana.

158. Employees of Cuttell-affiliated entities even lived together in a home owned by Cuttell. On information and belief, residents of this Cuttell-owned house have included, at various times, Ryan Miller of Darana / IHRA and Alex Roach of Darana / MECCA-GC / TMF.

159. Cuttell, Darana, IHRA, and other Cuttell-affiliated entities also share the same attorneys. The law firm Keating Muething & Klekamp PLL ("KMK Law") regularly serves as counsel to Cuttell and his entities. A social media post by KMK Law from one year ago stated that the KMK Law team, including attorney Ross Bextermueller, had attended an event at the Darana Raceway to support their clients Darryl Cuttell and the IHRA. Bextermueller's professional biography highlights his representation of IHRA and Darana Motorsports Holdings,

LLC in connection with those entities' acquisitions of various commercial agreements and properties. KMK Law also lists Darana as a representative client on its firm website.

160. Cuttell's failure to maintain a true separation among his business entities was particularly glaring for IHRA. As noted above, Cuttell's purchase of IHRA to pursue his personal hobby was immediately preceded by Darana entering into a multi-year sponsorship agreement with IHRA. Before the acquisition, the Cuttell-controlled TMF was also an official IHRA sponsor listed on IHRA's website.

161. On information and belief, Cuttell diverted proceeds derived from Darana's work for CTC to fund his personal acquisition and rapid expansion of IHRA and related motorsports ventures. Those ventures' voracious appetite for cash at least partly motivated Cuttell to engage in misconduct and stemmed from the following:

- Cuttell bought IHRA in 2024, the same year Darana began work for CTC.
- Shortly after, Cuttell, through Darana and related entities, embarked on an expansion campaign financed, on information and belief, with funds generated by or anticipated from Darana's work for CTC.
- For example, in March 2025, Cuttell announced agreements to purchase seven drag-racing tracks, including National Trail Raceway (Ohio), Maryland International Raceway (Maryland), Milan Dragway (Michigan), Dragway 42 (Ohio), Darlington Dragway (South Carolina), Galot Motorsports Park (North Carolina), and Kil-Kare Raceway (Ohio).
- Over the following months, Cuttell acquired still more facilities, including Rockingham Speedway, a storied NASCAR venue in North Carolina; Memphis International Raceway; Heartland Motorsports Park in Topeka, Kansas (reportedly for $40 million, far above its market value); Maple Grove Raceway in Pennsylvania; and Piedmont Dragway in North Carolina—bringing the total to about a dozen track purchases in 2025 alone.

162. The scale and pace of these acquisitions, occurring contemporaneously with Darana's receipt of hundreds of millions of dollars in payments on the supercomputing facility

projects, supports the reasonable inference that Cuttell was diverting those proceeds to fund his racing empire rather than applying them to Darana's legitimate business obligations.

163. That inference also is supported because, after CTC ceased payments to Cuttell and Darana, IHRA's operations rapidly deteriorated.

- IHRA abruptly canceled the remainder of its 2026 Outlaw Nitro Series and Stock Car Series; racers reported unpaid winner purses; vendors, track workers, and contractors also went unpaid; and the Memphis International Raceway redevelopment was placed on indefinite hold.
- Cuttell himself publicly acknowledged that the cash-flow problems caused by the alleged nonpayment "directly affected the IHRA's ability to operate," and admitted he owed approximately $200 million to vendors.
- On or about September 15, 2026, Rockingham Speedway – a crown jewel of Cuttell's acquisition spree – was put up for sale and will host no NASCAR racing in 2027.

164. IHRA's swift financial collapse once CTC's payments ceased demonstrates that IHRA's operations were dependent on, and sustained by, funds derived from Darana's work for CTC – funds that Cuttell misappropriated for his personal aggrandizement at the expense of Darana's subcontractors and vendors.

165. Cuttell also leveraged his control of Darana and IHRA to pursue a different personal hobby: offshore powerboating. Cuttell has purchased the 50-foot "Spirit of Qatar" catamaran, a powerboat that in 2014 broke the Lake of the Ozarks Shootout speed record. The famous racing boat is now painted bright green and affixed with Darana's logo and wordmark, intertwined with IHRA's own logo. As offshore powerboating world champion Steve Curtis explained in a recent interview, the boat has recently undergone an extensive round of operational improvements to its hydrodynamics and aerodynamics, apparently funded by Darana.

Curtis remarked that, "Darryl's company has a *huge* technology bank that we called upon. With that coupled with our knowledge, we feel it is [] practically a new boat."[8]

166. Cuttell's disregard of the corporate form pervaded his work for CTC on the supercomputing facility projects. From stacking multiple markups of his related entities' invoices, to billing Plaintiffs for hot-rod racing equipment and supplies, to using xAI's trademarks in IHRA promotional materials without authorization, Cuttell's conduct makes clear that his business entities are merely constituent parts of a unitary enterprise subject to his ultimate control. Cuttell is therefore personally responsible for Darana's and IHRA's breaches of contract, trademark infringement, conversion, fraud, unjust enrichment, and other wrongs.

### B. At a Minimum, Darana's and Cuttell's Misconduct Forfeited Cuttell's Performance Incentives Under Amendment One

167. Amendments One and Two gave Cuttell personal performance incentives tied to GPU milestones. In exchange, Darana agreed to work exclusively for CTC "performing Services related to Data Center Infrastructure Center Projects." Amendment One ¶ 4 (adding MSA Section 2.8 "Exclusivity").

168. The amendments also detailed when the award would vest and when it would be forfeited. As set forth above, the award vests "if and only if (i) Recipient is in strict compliance with the terms of the Agreement including, without limitation, **Section 2.8** (Exclusivity), and (ii) Recipient continued the provision of Services for Company until the expiration of the Exclusivity Period." Further, "[i]f such vesting conditions shall not be met," the award "will be automatically forfeited without any further action." Amendment Two, Ex. A ¶ 4.

[8] Matt Trulio, *Sneak Peek—Exit Spirit of Qatar, Enter Darana Hybrid Electro-Mechanical Solutions*, Speed on the Water (Aug. 20, 2025), https://speedonthewater.com/sneak-peek-exit-spirit-of-qatar-enter-darana-hybrid-electro-mechanical-solutions/.

169. Under the MSA and Amendments, Cuttell's award has been "automatically forfeited," Amendment Two, Ex. A ¶ 4, since neither of the two necessary vesting conditions has been satisfied. Darana was terminated for cause, and Darana and Cuttell are no longer providing services. Thus, the condition that "Recipient continue[s] . . . provision of Services for Company until the expiration of the Exclusivity Period" is not satisfied. The former condition likewise fails because Cuttell is not "in strict compliance with the terms of the Agreement." Darana has serially breached the MSA *and* Cuttell and Darana provided services to IHRA, in violation of the exclusivity provision.

**COUNT ONE**
**BREACH OF CONTRACT: OVERBILLING**
*CTC and MZX Against Defendants Darana and Cuttell*

170. Plaintiffs CTC and MZX incorporate the factual allegations above.

171. The MSA, as amended, constitutes a valid and enforceable contract.

172. The MSA permitted Darana to use subcontractors only after full disclosure to, and prior written consent from, CTC. MSA § 2.4. The MSA also prohibited Darana from marking up subcontractor labor more than 10% above Darana's costs. MSA § 2.4. Darana materially breached by repeatedly utilizing subcontractor labor without prior written consent and by marking up subcontractor labor in excess of the 10% cap allowed under the MSA.

173. CTC and MZX suffered damages when they paid invoices submitted by Darana that included charges for subcontractor labor that were more than 10% above the rates subcontractors charged to Darana.

174. The MSA's Basic Information Sheet and MSA Sections 2 and 4 permit Darana to invoice CTC and MZX only for services actually performed. Darana materially breached the MSA by invoicing CTC and MZX for services that were not actually performed, including by

invoicing 24 or more hours of labor per day for certain workers who did not work – and could not have worked – all of the hours for which CTC and MZX were charged.

175. CTC and MZX suffered damages when they paid invoices submitted by Darana that included charges for labor hours that were not actually worked.

176. When CTC and MZX paid invoices with excessive markups or inflated hours, they did not know the invoices included such overcharges.

177. As a result of the foregoing breaches, CTC and MZX have suffered damages in excess of $75,000, as may be determined in this proceeding. CTC and MZX estimate damages are in excess of $500 to $800 million but are unable to determine damages precisely due to Darana's breaches, including its breach of MSA Section 9.12.

## COUNT TWO
## BREACH OF CONTRACT: OUT-OF-SCOPE WORK
*CTC and MZX Against Defendants Darana and Cuttell*

178. Plaintiffs CTC and MZX incorporate the factual allegations above.

179. The MSA, as amended, constitutes a valid and enforceable contract.

180. Under the MSA, Darana was authorized to perform work for CTC and MZX supercomputing facility projects only, and CTC and MZX were obligated to pay for services only in connection with applicable SOWs or purchase orders. MSA Basic Information Sheet; Amendment One Basic Information Sheet; Amendment One § 2.8; MSA §§ 4, 4.1, 4.2. Darana materially breached by charging CTC and MZX for work performed on and materials shipped to sites belonging to entities other than CTC or MZX, including IHRA, that was unrelated to work on supercomputing facilities.

181. CTC and MZX suffered damages when they paid invoices submitted by Darana for such out-of-scope services and materials.

182. In connection with this unauthorized, out-of-scope work, Darana also violated MSA Section 8.2. Under MSA Section 8.2, Darana had "no right to use any trademark or trade name of Company or any affiliate of Company." xAI LLC is an affiliate of CTC, as CTC's sole member. Darana, through its sole owner Cuttell, breached that prohibition when it used xAI logos and trademarks during IHRA events and promotions.

183. CTC and its affiliates suffered damages as a result of this breach, including reputational harm resulting from associating CTC's affiliates with IHRA.

**COUNT THREE**
**LANHAM ACT VIOLATIONS**
*xAI Against Defendants IHRA and Darryl Cuttell*

184. Plaintiff xAI LLC incorporates the factual allegations above.

185. Plaintiff xAI LLC is the owner of several xAI trademarks, and xAI-formative trademarks, including a federally registered, valid, subsisting United States trademark registration for "X.AI," registered in International Classes 035 and 042 (U.S. Reg. No. 5171511). xAI LLC also owns an xAI trademark, which has been applied for specifically for use in connection with t-shirts, hats, jewelry, and related merchandise (U.S. Ser. No. 99130111). Further, xAI LLC owns an xAI word mark, which has been applied for under U.S. Ser. No. 99130097.

186. Plaintiff xAI LLC has used its xAI trademarks in commerce continuously and exclusively since at least as early as 2023.

187. Defendants IHRA and Cuttell have used in commerce, without the permission or consent of Plaintiff xAI LLC, the xAI trademarks that Plaintiff xAI LLC owns.

188. Defendants IHRA and Cuttell had actual knowledge of Plaintiff xAI LLC's ownership and use in commerce of Plaintiff's trademarks and, without the permission or consent of Plaintiff, have willfully and intentionally violated 15 U.S.C. § 1114.

189. Defendants' use of Plaintiff xAI LLC's trademarks is likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of Plaintiff xAI LLC with Defendants in violation of 15 U.S.C. § 1114.

190. Defendant Cuttell is vicariously liable for any and all unauthorized uses of Plaintiff xAI LLC's trademarks by Defendant IHRA. Cuttell owns and exercises full control over IHRA, including at all times relevant to the unauthorized uses of xAI LLC's trademarks alleged herein.

191. As a direct and proximate result of Defendants' unauthorized use of Plaintiff xAI LLC's trademarks, Defendants' actions have caused and will continue to cause reputational harm and other damages to Plaintiffs, and have unjustly enriched Defendants.

192. Plaintiffs are entitled to all remedies available under the law, including, but not limited to, injunctive relief, compensatory damages; disgorgement of Defendants' profits; statutory damages, loss of Plaintiffs' profits, mitigation costs, and costs and attorneys' fees.

193. The damages sustained by Plaintiffs as a result of the conduct alleged herein should be trebled in accordance with 15 U.S.C. § 1117(b).

## COUNT FOUR
## BREACH OF CONTRACT: FAILURE TO PROVIDE DATA

*CTC Against Defendants Darana and Cuttell*

194. Plaintiff CTC reincorporates the factual allegations above.

195. The MSA, as amended, constitutes a valid and enforceable contract.

196. The MSA required Darana to provide CTC data and information that CTC reasonably requested to validate Darana's invoices. MSA § 9.12.

197. Darana materially breached the MSA by refusing to provide data and information CTC reasonably requested to validate Darana's invoices for labor and materials, including by failing to provide underlying invoices from materials suppliers and subcontractors for labor, as well as lists of Darana's employees and subcontractors who performed services billed to CTC and their rates.

198. CTC suffered damages due to Darana's breaches, including legal expenses incurred attempting to obtain information Darana has refused to provide and costs CTC has incurred attempting to validate CTC invoices with incomplete data.

**COUNT FIVE**
**BREACH OF CONTRACT: MISAPPROPRIATION OF POST-TERMINATION PAYMENTS**
*CTC and MZX Against Defendants Darana and Cuttell*

199. Plaintiffs CTC and MZX incorporate the factual allegations above.

200. The MSA, as amended, constitutes a valid and enforceable contract.

201. MSA Section 7.4 required Darana to cooperate in an orderly wind-down of operations.

202. Darana materially breached the MSA by inducing CTC and MZX to make a $44.39 million payment after termination, and then diverting the payment to its own purposes. CTC and MZX made the payment – and Darana agreed the payment was made – to ensure that critical materials suppliers, which are providing materials for ongoing work at the supercomputing facility sites, did not record liens or file lawsuits, cut off the flow of materials to the project, or otherwise disrupt ongoing operations. Rather than directing the funds to these critical suppliers as required to ensure an orderly transition of the project following termination, Darana diverted the funds to pay other obligations Darana itself owed that were not critical to

ongoing operations and that were inconsistent with the parties' agreement concerning the payment.

203. In addition to breaching MSA Section 7.4, this also violated the parties' separate July 2, 2026 agreement concerning direction and use of the $44.39 million payment. The parties' agreement in writing that the payments were for specific materials was a valid and enforceable contract. And Darana breached by diverting the payment to purposes other than the specific materials agreed upon between the parties.

204. In the alternative, Darana's conduct violated the implied covenant of good faith and fair dealing. Darana's conduct was inconsistent with the parties' reasonable expectations under the MSA and their separate agreement concerning the July 2, 2026 payment, and prevented CTC and MZX from receiving the benefits thereof. Specifically, CTC and MZX contracted to obtain, and paid to secure, the ongoing supply of materials from vendors and suppliers that Darana had not paid, and Darana deprived CTC and MZX of that benefit by directing the $44.39 million July 2, 2026 payment to other purposes.

205. CTC and MZX have suffered damages as a result of Darana's breach, including the costs of paying suppliers directly for materials CTC and MZX already paid for on July 2, 2026.

**COUNT SIX**
**CONVERSION**
*CTC and MZX Against Defendants Darana and Cuttell*

206. Plaintiffs CTC and MZX incorporate the factual allegations above.

207. After CTC terminated Darana for cause, Darana induced CTC and MZX to make a $44,394,472.54 payment in order to pay downstream suppliers and vendors and thereby avoid disruption to ongoing work.

208. In entrusting this determinate sum to Darana, CTC and MZX gave specific instructions on the purpose of the payment. CTC and MZX instructed Darana to use the payment to pay specific suppliers that were critical to the project.

209. Instead, Darana converted the $44,394,472.54 payment, appropriating it for Darana's own use and benefit.

210. Notwithstanding CTC and MZX's specific instructions, Darana intentionally exercised dominion over the payment by choosing to direct the payment to its own purposes instead. Darana thereby defied CTC and MZX's explicit instructions and its right to control the purpose of the payment.

211. Darana committed its conversion of CTC and MZX's payment with intent, fraud, malice, insult, ill will, recklessness, or willful or conscious disregard of CTC and MZX's rights, entitling CTC and MZX to punitive damages.

**COUNT SEVEN**
**UNJUST ENRICHMENT**
*CTC and MZX Against All Defendants*

212. Plaintiffs CTC and MZX incorporate the factual allegations above.

213. Darana's above actions, to the extent not covered by the MSA, caused CTC and MZX to lose the financial benefit of the amounts that CTC and MZX paid to Darana above what CTC and MZX were contractually required to pay as a result of Darana's illegal, unfair, deceptive, and/or fraudulent conduct.

214. In doing so, Darana was unjustly enriched at the expense of and to the detriment of CTC and MZX.

215. Darana was unjustly enriched, *inter alia*, in the following ways:

a. By charging CTC and MZX, and accepting payment for, amounts in excess of those to which it was legally entitled.

b. By charging CTC and MZX, and retaining payments for, work performed on non-CTC and MZX sites.

c. By inducing CTC and MZX to make a $44.39 million payment for specific materials suppliers and then diverting those funds to its own purposes.

216. Allowing Darana to retain the payments it received from CTC and MZX for any such conduct would be inequitable, unconscionable, and against public policy.

217. As a direct and proximate result of Darana's conduct, CTC and MZX have been damaged and are entitled to restitution and interest in an amount to be determined at trial, disgorging all monies paid to Darana as a result of Darana's illegal, deceptive, unfair, and/or fraudulent practices.

218. CTC and MZX have no adequate remedy at law for these amounts.

**COUNT EIGHT**
**FRAUD**
*CTC and MZX Against Defendants Darana and Cuttell*

219. Plaintiffs CTC and MZX incorporate the factual allegations above.

220. Darana committed actionable fraud against CTC and MZX through affirmative misrepresentations and the concealment of material facts. For example:

a. Darana affirmatively misrepresented that work was performed by Darana employees when it was in fact performed by subcontractors.

b. Darana affirmatively misrepresented that work was performed for the benefit of CTC and MZX sites when it was in fact performed for the benefit of other entities.

c. Darana affirmatively misrepresented that a $44.39 million payment made by CTC and MZX on July 2, 2026 would be used to satisfy invoices for

materials to particular suppliers when in fact Darana applied the payment to other purposes.

221. Darana also made or approved materially false and misleading statements to CTC and MZX when it contracted to perform the services under the MSA as amended.

222. These false statements and misrepresentations were material.

223. These false statements and misrepresentations were false when made.

224. Darana made the foregoing false statements and misrepresentations that omitted and concealed material facts knowingly and/or recklessly despite being aware of their falsity.

225. CTC and MZX reasonably and actually relied on Darana's misrepresentations and concealments.

226. As a direct and proximate result of such unlawful conduct, CTC and MZX have suffered, and will continue to suffer, damages in an amount to be proven at trial.

227. Darana's acts were undertaken intentionally and in conscious disregard of CTC and MZX's rights, and were malicious, fraudulent, and oppressive.

228. CTC and MZX are entitled to damages and should be awarded exemplary and punitive damages in an appropriate amount to punish Darana and to deter similar fraudulent conduct in the future.

## COUNT NINE
## BREACH OF CONTRACT: ORDERLY WIND-DOWN

*CTC and MZX Against Defendants Darana and Cuttell*

229. Plaintiffs CTC and MZX incorporate the factual allegations above.

230. The MSA, as amended, constitutes a valid and enforceable contract.

231. MSA Section 7.4 required Darana to cooperate in an orderly wind-down of operations.

232. Darana materially breached the MSA by canceling and seeking to prevent the transfer of permits necessary for ongoing operations on the supercomputing facility project, instead of working with CTC to transfer them. Darana also materially breached by filing liens against CTC properties and attempting to create negative publicity against CTC and MZX in the press.

233. Darana's failure to cooperate in an orderly wind-down also entailed an independent breach of MSA Section 4.2.1, which required Darana to discharge or otherwise resolve all liens filed by one of Darana's subcontractors or suppliers.

234. Darana materially breached the MSA by failing to cause to be discharged the liens and nonpayment notices filed by Darana's subcontractors and suppliers against Plaintiffs, which liens and notices total more than $7 million in Tennessee and more than $46 million in Mississippi.

235. CTC and MZX suffered damages as a result of Darana's breaches, including spending more than $8 million to renew the permits on an expedited basis that would not have been required if Darana had worked with CTC to transfer them, and incurring substantial attorneys' fees and business expenses in connection with the liens filed by Darana's subcontractors and suppliers. Under Section 4.2.1 of the MSA, Darana is required to indemnify CTC and MZX for those expenses, including those attorney's fees.

## COUNT TEN
## BREACH OF CONTRACT: FORUM SELECTION CLAUSE
*CTC and MZX Against Defendants Darana and Cuttell*

236. Plaintiffs CTC and MZX incorporate the factual allegations above.

237. The MSA, as amended, constitutes a valid and enforceable contract.

238. The forum selection clause contained in MSA Section 9.17 required that Darana bring any litigation concerning its work on the xAI supercomputing facilities in Memphis, Tennessee.

239. Defendants materially breached that forum selection clause by filing a lawsuit in Mississippi state court seeking $432,455,431.16 in compensatory damages for work that the MSA governed, payment for which was withheld pursuant to Plaintiffs' rights under the MSA and because of Defendants' own misconduct.

240. Defendants' attempt to litigate their claims in Mississippi state court is without basis and in clear contravention of the parties' agreement in the MSA's forum-selection clause.

241. CTC and MZX suffered damages as a result of Defendants' breach, including substantial expenditures on parallel litigation in a separate forum to defend claims that should have been brought in Tennessee and consolidated with this case.

**COUNT ELEVEN**
**DECLARATORY JUDGMENT**
*CTC and MZX Against Defendants Darana and Cuttell*

242. Plaintiffs CTC and MZX incorporate the factual allegations above.

243. A real and actual controversy exists regarding the parties' rights and obligations under the MSA concerning: (1) CTC and MZX's right to retain all amounts withheld pursuant to MSA Section 7.2 as compensation for Darana's breaches; (2) the forfeiture of Darryl Cuttell's equity incentive award pursuant to Amendment Two; (3) the applicability of the MSA to the work Darana performed for CTC and MZX in Mississippi; and (4) Darana's obligation to bond off any lien filed by any of its subcontractors or suppliers against Plaintiffs within three days of its filing, or to compensate Plaintiffs for any costs incurred in causing such lien to be discharged.

244. This action is not "premature." Certain issues in dispute are currently appropriate for judicial interpretation and determination, including CTC and MZX's right to withhold

amounts otherwise due to compensate for damages caused by Darana's breaches, whether Darana and Cuttell have irrevocably failed to satisfy conditions necessary to obtain the incentive award, whether the MSA applies to the work Darana performed for CTC and MZX in Mississippi, and whether Darana is obligated to bond off its subcontractors' and suppliers' liens against Plaintiffs or compensate Plaintiffs for their costs of discharging such liens. Substantial potential financial burdens and losses are a real and existing threat to CTC and MZX as herein alleged.

245. CTC, MZX, Darana, and Cuttell have substantial need to know their respective rights and obligations under the MSA, as amended.

246. CTC and MZX are entitled to a declaration (1) that they were entitled to terminate the MSA for cause pursuant to MSA Section 7.2; (2) that they are entitled to permanently withhold amounts retained pursuant to MSA Section 7.2 to compensate for losses caused by Darana's breaches and that Darana is not entitled to any further payment under the MSA; (3) that Recipient Darryl Cuttell's equity incentive award under Amendments One and Two is forfeited; (4) the MSA governs all work Darana performed for CTC and MZX in Mississippi, including the work that Darana falsely attributes to a separate "verbal agreement" with Christian Kauffman; and (5) Darana is obligated to bond off or otherwise resolve any lien filed by one of its subcontractors or suppliers against Plaintiffs within three days of its filing, or compensate Plaintiffs for all costs incurred in causing such lien to be discharged.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs xAI LLC, CTC, and MZX respectfully pray for judgment against Defendants as follows:

(a) Compensatory damages in an amount to be proven at trial, estimated to be $500 million or more;

(b) Mitigation costs;

(c) Punitive damages;

(d) Injunctive relief as set forth in Count Three;

(e) Statutory damages as set forth in Count Three;

(f) Pre-judgment interest at the applicable rate from the date of Defendants' breach;

(g) Post-judgment interest at the rate provided by 28 U.S.C. § 1961;

(h) Attorneys' fees and expenses;

(i) Costs of suit;

(j) Declaratory Judgment as set forth in Count Eleven; and

(k) Such other and further relief as this Court deems just and proper.

DATED: September 17, 2026

Respectfully submitted,

*/s/ Daniel W. Van Horn*
Daniel W. Van Horn (BPR 018940)
Kathryn K. Van Namen (BPR 031322)
Andrew B. Schrack (BPR 037624)
BUTLER SNOW LLP
6075 Poplar Avenue, Suite 500
Memphis, TN 38119
Tel.: (901) 680-7200
Fax: (901) 680-7201
Danny.VanHorn@butlersnow.com
Kate.VanNamen@butlersnow.com
Andrew.Schrack@butlersnow.com

Joshua D. Branson (admitted *pro hac vice*)
Andrew C. Shen (admitted *pro hac vice*)
Matthew M. Duffy (admitted *pro hac vice*)
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Office: (202) 326-7900
Fax: (202) 326-7999
jbranson@kellogghansen.com
ashen@kellogghansen.com
mduffy@kellogghansen.com

Kenton J. Skarin
Reid E. Coleman
SPACEXAI
800 W. Cesar Chavez Street
Austin, TX 78701
kskarin@x.ai
rcoleman@x.ai

*Counsel for Plaintiffs x.AI LLC,*
*CTC Property LLC, and MZX Tech LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 17, 2026, the foregoing document was filed through the ECF system, which caused a copy of the document to be served on all registered participants identified on the Notice of Electronic Filing.

/s/ Daniel W. Van Horn
Daniel W. Van Horn

BUTLER SNOW LLP

*Counsel for Defendants CTC Property LLC and MZX Tech LLC*